# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**In re: SEARS, ROEBUCK AND CO. FRONT-LOADING WASHER PRODUCTS LIABILITY LITIGATION**

*This Document Relates to CCU Claims*

Case No. 06 C 7023
Consolidated with Case Nos.
07 C 0412 and 08 C 1832

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

In 2001, Whirlpool began manufacturing front-load washing machines and selling them under its own brand. In 2005, Sears began to sell the same Whirlpool-manufactured machines under the Sears brand. Unfortunately, some buyers of these machines began to experience problems. The buyers began to file lawsuits against both Whirlpool and Sears, asserting the washing machines suffered two types of defects: (1) the "Biofilm defect," which caused mold and mildew to grow inside the machines; and (2) the "CCU defect," which caused the machines' Central Control Unit to malfunction. The cases against Sears are all pending in this Court. The cases against Whirlpool were joined through multidistrict litigation and are all pending in the Northern District of Ohio. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, case no. 08-WP-65000, MDL No. 2001 (N.D. Ohio).

Recently, the parties in both the *Sears* and *Whirlpool* cases announced they had settled all claims. Rather than agree to a "Sears Settlement" and a "Whirlpool Settlement," however, it proved easier to agree to a "CCU Settlement" and a "Biofilm Settlement." The parties have chosen to file their CCU Settlement papers (resolving

CCU claims against both Sears and Whirlpool) in this Court, and to file their Bio-film Settlement papers (resolving Biofilm claims against both Sears and Whirlpool) in the MDL Court.

On August 21, 2015, this Court entered an Order granting preliminary approval to the CCU Class Action Settlement Agreement. *See* docket no. 514 ("*Preliminary Approval Order*"). The plaintiffs, Sears, and Whirlpool now join to ask the Court for final approval. *See* docket no. 569. For the reasons stated below, the joint motion for final approval of the CCU class action settlement is **GRANTED**.

In addition, class counsel has moved for an award of attorney fees, reimburse-ment of expenses, and incentive awards for representative plaintiffs (docket no. 530). Defendants take issue with the requested amounts of fees and expenses, but do not object to the requested amount of incentive awards. Accordingly, the Court **GRANTS** this motion **in part** as unopposed and hereby awards to each of the nine representative plaintiffs an incentive award of $4,000, for a total of $36,000.[1] The Court will address class counsel's request for fees and expenses in a separate Order.

## I. PROCEDURAL HISTORY

On December 19, 2006, a group of five plaintiffs filed this action against Sears, complaining that the Kenmore-brand front-load washers they had purchased from Sears suffered serious performance problems. After two other groups of plaintiffs

---

[1] The nine named representative plaintiffs in the consolidated complaint are Kevin Barnes, Alfred Blair, Martin Champion, Lauren Crane, Alan Jarashow, Joseph Leonard, Lawrence L'Hommedieu, Victor Matos, and Victoria Poulsen.

filed similar lawsuits against Sears, the three cases were consolidated in this Court for pretrial purposes. *See* docket nos. 36, 96.

About two years later, on March 24, 2009, plaintiff Victoria Poulsen filed a similar action against Whirlpool (which manufactured the washers at issue under both the Kenmore and Whirlpool brand names) in the U.S. District Court for the Eastern District of California. The MDL Panel transferred the *Poulsen* action to the *Whirlpool* multidistrict litigation in the Northern District of Ohio.

In 2011, this Court certified a class of all Illinois, Indiana, Kentucky, Minnesota, Texas, and California purchasers of the Kenmore-brand Washers who suffered the alleged CCU defect. *See* docket no. 285. The Seventh Circuit upheld that ruling on appeal, but clarified that the class was properly certified only for class liability proceedings, not for a determination of classwide damages. *See Butler v. Sears, Roebuck & Co.*, 702 F.3d 359 (7th Cir. 2012), *rehearing and rehearing en banc denied* (7th Cir. 2012), *cert. granted, judgment vacated*, 133 S. Ct. 2268 (2013), *judgment reinstated, affirmed in relevant part*, 727 F.3d 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014). The parties and the Court later agreed to conduct the first trial on behalf of the Illinois class only, which the Court scheduled for July 2015.

Two months before the scheduled trial, the parties informed the Court they had settled plaintiffs' CCU claims. *See* docket no. 483. The Court then granted the parties' joint motion for preliminary approval of the CCU Settlement Agreement. *See* docket no. 514. For purposes of accomplishing the *nationwide* proposed class settlement in this Court, plaintiffs amended the complaint in this case to add Poulsen's

claims. *See* docket no. 508. The parties state that, if the Court approves their CCU

Settlement Agreement, they will move the MDL Court to dismiss the *Poulsen* case

with prejudice. Thus, this Court's approval of the CCU settlement agreement will

serve to resolve the class-action CCU claims against both Sears and Whirlpool.

## II. THE CLAIMS AT ISSUE

In their consolidated class action complaint, the nine representative plaintiffs

assert that Sears and Whirlpool sold them certain models of front-load washing ma-

chines that "had as component parts Matador 1 Central Control Unit ("CCU")

boards manufactured by Bitron . . . on a CEM-1 printed circuit board." Complaint at

¶2 (docket no. 508). Plaintiffs allege these CCU circuit boards were defective, caus-

ing problems during the wash cycle, including "but not limited to, (a) premature and

repeated mechanical failure; (b) stopping or not starting; (c) door remaining locked;

and (d) displaying a variety of error codes such as F11 and FDL." *Id.* Plaintiffs' ex-

pert later opined that the CCUs were defective because they were printed on a ma-

terial known as CEM-1, which is brittle, rather than a more flexible material such

as CEM-3; when consumers operated the washers, normal vibrations stressed the

brittle CEM-1 material, causing micro-fractures to the CCU's solder connections

and breaking the electronic circuits. *See* docket no. 564-1 (report of plaintiffs' expert

Michael Pecht).

In their consolidated complaint, plaintiffs state claims for various species of

breach of express and implied warranty under State and federal law. *See* complaint

at ¶4 (docket no. 508). Plaintiffs assert these claims on behalf of two classes: (1) a

nationwide class of owners of certain Sears Kenmore washers that contain the "Matador 1" CCU; and (2) a California class of owners of certain Whirlpool washers that contain the "Matador 1" CCU. *Id.* at ¶55.[2] The parties explain that these two classes include about 450,000 Kenmore washers and 86,500 Whirlpool washers.

## III. SETTLEMENT AGREEMENT

The principal feature of the parties' CCU Settlement Agreement is that defendants will pay full monetary compensation to class members who suffered out-of-pocket expenses for repairs related to the CCU problem. The Settlement Agreement also provides defendants will: (1) pay attorneys fees to class counsel, (2) reimburse class counsel's litigation expenses, (3) pay incentive awards to the nine named plaintiffs, and (4) pay the costs of settlement administration and class notice. In exchange, class members who do not opt out will release all of their CCU-based claims. (In the CCU settlement, class members will *not* be releasing any of their biofilm-based claims.)

The terms of the CCU Settlement Agreement are described in more detail, below.

---

[2] Originally, in the *Sears* litigation, plaintiffs brought a claim for injunctive relief on behalf of a nationwide class of owners of Sears-branded washers with faulty CCUs. *See* Complaint at 7 (docket no. 1). In contrast, plaintiffs in the *Whirlpool* MDL brought claims only on behalf of a class of California owners of Whirlpool-branded washers with faulty CCUs. *See Poulsen v. Whirlpool Corp.*, case no. 09-WP-65003 (N.D. Ohio) (docket no. 1, complaint at ¶52). The current Settlement Agreement reflects the original scope of each class—the Sears settlement class includes a nationwide group of Sears washer owners, while the Whirlpool settlement class remains limited to California Whirlpool washer owners. The parties recently filed a consolidated complaint in this case to mirror these settlement class definitions, *see* docket no. 508 at ¶55.

- **The Settlement Classes**

The Kenmore Settlement Class is defined to include all persons who, while living in the United States, purchased or received as a gift a new Kenmore Washer. The term "Kenmore Washer" is defined to include a Kenmore-brand front-loading washing machine manufactured by Whirlpool between June 8, 2004, and February 28, 2006, with a Bitron-manufactured Matador 1 CCU. These Kenmore washers are identifiable by specific combinations of model and serial numbers. S.A. at 6.

Similarly, the Whirlpool Settlement Class is defined to include all persons who, while in the State of California, purchased or received as a gift a new Whirlpool Washer. The term "Whirlpool Washer" is defined to include a Whirlpool-brand front-loading washing machine manufactured by Whirlpool between May 25, 2004, and February 28, 2006, with a Bitron-manufactured Matador 1 CCU. These Whirlpool Washers are also identifiable by specific combinations of model and serial numbers. S.A. at 11-12.

- **Compensable Performance Problems**

The Settlement Agreement provides monetary compensation for class members whose washers suffered certain "Performance Problems," and who suffered out-of-pocket losses to pay for "Qualifying Repairs."

Notably, the definition of a CCU-related Performance Problem is fairly broad—it includes, *but is not limited to*, "(a) failure of the Washer to complete a cycle or interruption of the cycle; (b) failure of the door to lock at the start of the wash cycle or display of an Fdl error code on the control console, or both; (c) failure of the door to

unlock at the end of the wash cycle or display of an Fdu error code on the control console, or both; (d) display of an F11 error code; and (e) service calls to repair or replace the CCU, the door lock assembly, the wire harness between the CCU and the MCU [Motor Control Unit], the wire harness between the CCU and the door lock, or the MCU." S.A. at 7.

Compensation is available for "Qualifying Repairs," which essentially tracks the definition of Performance Problems. Thus, a "Qualifying Repair" means that "***within three years after the Purchase Date***: (1) a Service Technician repaired or replaced the Washer's CCU, or (2) a Settlement Class Member otherwise incurred documented out of pocket costs to repair the Washer due to the Washer's Performance Problem . . . , or (3) a Settlement Class Member replaced the Washer or otherwise took it out of service after contacting Whirlpool, Sears, an authorized Whirlpool or Sears retailer, or a Service Technician about a Performance Problem . . . ." S.A. at 8 (emphasis added).

The three-year period is especially notable, because the original manufacturer's warranty for the Washers was limited to one year for labor and two years for parts. Thus, the Settlement Agreement provides benefits in excess of the defendants' written warranties.

- **Amount of Compensation**

The amount of compensation to which class members are entitled depends on the amount of repair costs they incurred and the proofs they submit. As a general matter, however, class members will receive a minimum of $150.00 for a valid claim.

This is not a "limited fund" settlement, meaning there is no cap on the total amount that defendants may ultimately be required to pay for valid claims; nor is there a cap on how much an individual class member may receive. Plaintiffs accurately summarize the compensation scheme as follows (quoted from docket no. 503-1 at 10-11, emphasis in original):

> ***Reimbursement for Paid Qualifying Repairs***: Eligible Settlement Class Members will receive the **full amount**—with no cap—of any documented costs for their First Paid Repair for any Performance Problems within 3 years of purchase. Moreover, to the extent Settlement Class Members can provide sufficient documentary proof for their First Paid Repair but the proof does not show the amount paid for that repair, such Settlement Class Members will nonetheless receive $150. S.A. §IV.C.1. Class members can also get additional compensation (on the same terms) for a Second Paid Repair (as long as the repair occurs less than 54 months after purchase). S.A. §IV.C.2.a.

> ***Reimbursement for Replacement***: If the Settlement Class Member chose to replace, rather than repair, the Washer or otherwise took it out of service after contacting Whirlpool, Sears, or an Authorized Service Technician about a Performance Problem, the Settlement Class Member will be reimbursed for the amount that sufficient documentary proof shows the Settlement Class Member actually paid for the replacement clothes washer up to a **maximum of $300.** S.A. §IV.C.2.

***Compensation for Qualifying Service Contracts***: Class Members who effected repairs of performance promise by purchasing a warranty service contract will be reimbursed **$100** to partially offset the cost of the service contract. The slightly-reduced amount reflects that the service contract provided value in addition to the cost of repairing the CCU Performance Problem. S.A. §IV.C.4.

***Compensation for Excessive Repairs***: Settlement Class Members [who] had the CCU replaced by a Service Technician on three occasions within four years of purchase will receive the **greater of** (i) the purchase price of the Washer or (ii) the aggregate cost for the three repairs. S.A. §IV.C.5.

***Offsets***: The above compensation is subject to an offset if Whirlpool or Sears previously provided compensation for CCU Performance Problems (e.g., a policy-adjust cash payment, a partial refund, a discount off the regular price of a new clothes washer, a coupon applicable to the purchase of a new clothes washer that was redeemed, etc.). S.A. §IV.D.

With regard to how the "compensable amounts" payable to class members is actually panning out under the Settlement Agreement, the Claims Administrator reports that, so far, the average amount for valid claims is about $277.

- **Notice and The Claims Process**

When a consumer purchases a Sears washer, Sears usually collects point-of-purchase data, including the contact information for the consumer and also serial and model numbers of the purchased washer. To a lesser extent, Whirlpool collects

similar information (mostly through warranty registration card returns, rather than point-of-purchase data). As a result, the defendants know the specific identify of the vast majority of purchasers of the Kenmore Washers at issue, and many of the Whirlpool Washers at issue. Further, in many cases, Sears and Whirlpool know whether those purchasers already complained about CCU-related problems—for example, Sears' database would also reveal that a purchaser of a Kenmore Washer made a service call to Sears shortly after buying the machine, asking why the console keeps displaying the F11 error code.

These circumstances allowed Notice to be more precise, and also allowed the claim submission process to be more streamlined. Regarding Notice, the Claims Administrator explains he used defendants' databases to identify names and addresses for 486,387 individuals known to have purchased the Washers at issue, and also to send 41,072 emails directly to individuals known to have purchased the Washers at issue. *See* docket no. 523-1 at ¶¶15-16. In addition, the Claims Administrator undertook publication notice via newspaper, magazine, and the internet, with special focus on California. *Id.* at ¶17. By using defendants' databases, this Notice plan made it highly likely that class members would learn of their rights.

Moreover, defendants' databases allowed the Claims Administrator to streamline the claims submission process. Whenever possible, class members were sent postcard notices that contained a specific, individualized code; when the class member entered this code in the online claim form, many fields "auto-populated," making claim submission easier. And if a class member could also "be identified in

Whirlpool's or Sears's databases as having paid for a Qualifying Repair or as having paid for a Qualifying Service Contract," then he or she was deemed a "Prequalified Class Member." S.A. at 7. Prequalified Class Members are not required to submit *any* documentation to support their claims; to receive reimbursement for the amounts that Sears already knows the Prequalified Class Members paid, these Class Members need only confirm their current name and address, check the eligibility boxes on the online Claim Form, and submit their electronic signature. *Id.* at 20.

Finally, defendants also agreed that, if a non-prequalified class member did not provide necessary documentation of an out-of-pocket expense for a Qualifying Repair, the Claims Administrator would search defendants' databases for proof of a claimed Qualifying Repair, so that the claim might be cured. *Id.* at 21.

In sum, because defendants can identify the vast majority of purchasers of the Washers at issue, and even whether those purchasers have already paid for a Qualifying Repair, the Claims Administrator was better able to ensure all class members (a) got notice and (b) could easily submit a claim.

- **Attorney Fees, Expenses, and Class Representative Awards**

By separate motion, class counsel ask the Court to approve: (1) an attorney fee award of $6 million; (2) reimbursement of about $187,000 in litigation costs and expenses; and (3) incentive awards of $4,000 to each of the nine representative plaintiffs. *See* docket no. 530. The Court will address that motion more fully in a separate

opinion. It is worth noting now, however, how the Settlement Agreement addresses these subjects.

**Attorney Fees and Expenses**: The Settlement Agreement provides that defendants "have agreed to pay Class Counsel reasonable attorneys' fees and costs, without reducing the amount of money available to pay Valid Claims submitted by Settlement Class Members or the amount of money to be paid for work performed by the Settlement Administrator." S.A. at 34-35. Thus, unlike cases where there is a limited settlement fund, payment to class counsel of fees and expenses will not in any way reduce the amount received by the settlement class.

**Service Awards**: The Settlement Agreement provides that defendants "shall" pay incentive awards of $4,000 each to the nine named plaintiffs, subject to Court approval. Like class counsel's fees and expenses, this $36,000 amount is in addition to any amounts the defendants will pay as settlement benefits to class members. S.A. at 29. Payment of these incentive awards will not in any way reduce the amount received by the settlement class.

In other words, eligible class members will be paid in full, regardless of defendants' separate obligations for attorney fees, administration costs, or anything else. And the approval and enforceability of the Settlement Agreement is not contingent on the Court's separate approval of a specific award of attorney fees, expenses, or class representative awards. S.A. at 36-37.

- **Claims Administration**

The Court previously approved Kurtzman, Carson Consultants, LLC ("KCC") as the settlement administrator. KCC's duties include: (1) preparing and issuing Class Notice; (2) identifying Prequalified Class Members; (3) creating the online claims process and written claim forms; (3) setting up and maintaining the settlement website and toll-free number; (4) responding to class member inquiries; (5) assessing and approving or rejecting claims; and (5) issuing settlement payments. S.A. at §§IV.A.4 & V.

All costs of notice and claims administration are paid by defendants and do not reduce the amounts available to class members. *Id.* at §VI.

### III. LEGAL STANDARDS

This Court must determine whether the CCU class-action Settlement Agreement should be ratified. Federal Rule of Civil Procedure 23(e) mandates that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." To certify a class for settlement, a court must first consider whether the proposed class meets the requirements of Rule 23(a) & (b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Court is also required to direct adequate notice to members of the settlement class. Fed. R. Civ. P. 23(c)(2)(B). If these requirements are met, then the court must ensure the proposed class action settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

Under Seventh Circuit law, a district court must, in evaluating the fairness of a settlement, consider "[a] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [b] an assessment of the likely complexity, length and expense of the litigation, [c] an evaluation of the amount of opposition to settlement among affected parties, [d] the opinion of competent counsel, and [e] the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). In reviewing these factors, courts view the facts "in the light most favorable to the settlement." *Isby*, 75 F.3d at 1199 (quoting *Armstrong v. Board of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 315 (7th Cir.1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)).

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'" *Id.* (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)).

"Federal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196; *see Armstrong*, 616 F.2d at 313 ("In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.") (citations and internal quotation marks omitted). Nevertheless, the Seventh Circuit has warned that "the structure of class actions under Rule 23 . . . gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652; *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 788 (N.D. Ill. 2015).

When considering whether a proposed settlement meets the requirements of Rule 23, the Court does not decide whether the agreement reached between the parties is the "best possible deal" for plaintiffs, nor whether the class has received the same benefit from the settlement as they would have recovered from a trial. *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1004 (N.D. Ill. 2000). Courts "should not substitute their own judgment as to the optimal settlement terms for

the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315. "Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations and internal quotation marks omitted).

## V. ANALYSIS

### A. Notice was Sufficient.

Rule 23(c)(2)(B) requires that, "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Fed. R. Civ. P. 23(e)(1). This Court earlier approved the plan of notice and the claim forms, concluding they "satisf[y] the notice requirements of Federal Rule of Civil Procedure 23(e) and all applicable federal law." *See* docket no. 514 at 8. The Settlement Administrator mailed a copy of the notice to all Settlement Class members whose address reasonably could be identified in Whirlpool's or Sears' records, and also emailed a copy of the notice to all Settlement Class members for whom Sears or Whirlpool had email addresses. This effort provided direct notice to about 89% of class members.

Because direct notice could not be sent to a substantial percentage of the California Whirlpool class membership – since many of those individuals could not be identified in Whirlpool's or Sears' records – the Settlement Administrator also is-

sued publication notice, focused on California. *See Mangone v. First USA Bank*, 206 F.R.D. 222, 233-34 (S.D. Ill. 2001) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both F.R.C.P. 23 and the due process clause.") (quoting *Zimmer Paper Prods. Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3rd Cir. 1985)). This publication notice included: (1) a full-page notice in the November 16, 2015, issue of the California edition of *People* magazine; (2) banner advertisements on Facebook from October 5, 2015, to November 1, 2015, with 11,000,000 unique impressions; and (3) a ⅛-page notice that appeared once a week for four consecutive weeks during October, 2015 in the Los Angeles Daily News. The Settlement Administrator also posted Notice online at a dedicated website, www.CCUsettlement.com.

Furthermore, plaintiffs' counsel explains that, after Notice was sent, counsel "vetted the Settlement Website and claims process functionality and identified certain inadequacies and brought them to the attention of defendants and the Settlement Administrator. Those inadequacies were fixed within a few days. While those inadequacies were short-lived, Class Counsel insisted out of an abundance of caution that, in addition to the Court-approved plan, an additional corrective postcard notice be sent to *all* Prequalified Class Members." Docket no. 570 at 2 (emphasis added) (the "inadequacies" involved failure of the online claim form to correctly auto-populate certain fields; the corrective notice apparently yielded a substantial increase in claim submissions). For similar reasons, class counsel later convinced defendants and the Settlement Administrator to send a corrective notice to about

30,000 non-Prequalified Class Members. These additional notices served only to improve the Notice Plan earlier approved by the Court.

Class counsel states that "[t]he claims rate for both [Prequalified and non-Prequalified Class members] is at the high end of what Class Counsel expected given the nature of the case and settlement based on their decades of experience prosecuting consumer class cases. Class Counsel have also been advised that Counsel for Defendants and the Settlement Administrator concur that claims rate for both groups is excellent and at the high end of what they each expected at the outset of the notice and claims process." Docket no. 570-1 at ¶6.

The Court concludes that, under the circumstances of this case, the Settlement Administrator's notice program was the "best notice that is practicable," Fed. R. Civ. P. 23(c)(2)(B), and was "reasonably calculated to reach interested parties," *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 318 (1950). Further, notice was sent to the appropriate federal and state officials, as required under the Class Action Fairness Act, 28 U.S.C. §1715.

## B. The Requirements for Class Certification are Met.

A settlement class must meet the requirements of Rules 23(a) & (b). The Seventh Circuit Court of Appeals has already affirmed this Court's conclusion that certification of a liability-only, multi-state class for trial is appropriate under Rules 23(a) and (b)(3). Given that the requirements for a settlement class are generally less onerous than those for a trial class, there is little question that the proposed nationwide settlement class also meets the requirements of Rules 23(a) and (b)(3).

As the Supreme Court has explained, when "[c]onfronted with a request for settlement-only class certification, a [trial] court need [no longer] inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial," *Amchem*, 521 U.S. at 620.

Plaintiffs and defendants have each stipulated that the two Settlement Classes, as defined in the Settlement Agreement, meet all the requirements of Rule 23. A quick examination of Rule 23's prerequisites confirm the propriety of class certification for settlement purposes:

*Numerosity*—Rule 23(a)(1) requires that joinder of all class members be impracticable. Here, the total Settlement Class consists of approximately 550,000 purchasers and owners, which easily satisfies the numerosity requirement. *See Hyderi v. Wash. Mutual Bank, F.A.*, 235 F.R.D. 390, 396 (N.D. Ill. 2006) (finding that over 1,000 class members satisfied the numerosity requirement).

*Commonality*—Rule 23(a)(2) requires that Settlement Class Members share common questions of law and fact. This rule is easily satisfied; two of the most important common questions shared by Class Members are: (1) whether the Class Washers contain a defect that caused CCU malfunctions; and (2) whether Class Members can recover damages based on those alleged defects.

*Typicality*—Rule 23(a)(3) requires that the named plaintiffs' claims be typical of the claims of the class. As Class Washer owners, the named plaintiffs are members of the Settlement Class and they claim they have been damaged by the same con-

duct that has allegedly damaged all the other Settlement Class members. Moreover, the claims of the named plaintiffs and other members of the Settlement Class are based upon similar theories, such as breach of express and implied warranty. Finally, the named plaintiffs' claims are not in conflict or antagonistic to the claims of the Settlement Class. The typicality requirement is satisfied.

*Adequacy*—Rule 23(a)(4) requires that the named plaintiffs and their attorneys be able to fairly and adequately represent the interests of the class. There is no question but that class counsel is highly experienced, and class counsel has clearly demonstrated (for over nine years) that it can and will continue to fully protect the interests of the Settlement Class. Moreover, neither plaintiffs nor class counsel have any interests that conflict with, or are adverse to, those of the Settlement Class.

*Predominance*—Rule 23(b)(3) requires that questions of law or fact common to the class predominate over individual questions, and that a class settlement is superior to other available methods for the fair and efficient adjudication of the controversy. The Seventh Circuit has confirmed that common questions predominate in this case. *See Butler*, 727 F.3d at 801 (holding the predominance requirement is satisfied because "[t]here is a single, central, common issue of liability: whether the Sears washing machine was defective."). Further, it is axiomatic that a class settlement is superior to continued litigation. Moreover, even though warranty laws vary from State to State, the settlement class remains "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

In sum, certification of the Settlement Classes, as defined in the Settlement Agreement at §I.R and §I.PP, is appropriate.

## C. The CCU Settlement Agreement is Fair, Reasonable, and Adequate.

Examination of the five factors identified in *Synfuel* leads the Court to easily conclude the CCU Settlement Agreement is "fair, reasonable, and adequate," and therefore meets the requirements of Rule 23(e)(2).

### 1. *Strength of Plaintiffs' Case Compared to the Amount of Settlement.*

Plaintiffs assert they "believe that their claims against Defendants have merit and that they could make a compelling case if their claims were tried." Docket no. 570 at 9. But it is clear that plaintiffs would face numerous difficult challenges if this litigation were to continue, each with an unpredictable outcome. And when "considering the strength of the plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Southwest Airlines Voucher Litig.*, 2013 WL 4510197 at *7 (N.D. Ill. Aug. 26, 2013), *affirmed*, 799 F.3d 701 (7th Cir. 2015).

In this case, the following circumstances suggest that final victory for plaintiffs at the Illinois class trial, in the form of a money judgment, was hardly assured: (1) defendants' expert insists the class members' Washers did not suffer a common CCU defect; rather, a short-term manufacturing problem affected a *small percentage* of the Washers' CCUs, and that problem was quickly remedied; (2) numerous class members (probably the great majority) never experienced a CCU-related problem; (3) defendants were likely to challenge again the propriety of class certification, which was never addressed on the merits by the Supreme Court; (4) defendants

would probably appeal any adverse judgment on the merits, even if class certification was upheld; and (5) because certification was for a liability-only class, additional proceedings (probably individualized for each plaintiff) would have to take place to establish damages. Moreover, even if plaintiffs succeeded in the Illinois class action, the result could be different for other State classes, if only because their warranty laws are different. And, of course, it would take huge amounts of time and money for plaintiffs to pursue these uncertain outcomes.

Assessed in light of these circumstances, the settlement terms for the class are excellent. Eligible class members will receive a complete, full-value, dollar-for-dollar recovery of all costs they incurred to fix a CCU-related problem. Further, class members will enjoy a streamlined claims process to obtain cash reimbursements for the full amount of their damages. Class counsel trumpets, and defendants concede, that the settlement "provides as good, if not a better, recovery for Class Members than could have been achieved" at trial, even if plaintiffs cleared all of the above-mentioned hurdles. Docket no. 570 at 4; *see also* docket no. 571 at 16 (defendants state that "[t]he result likely is better than what Plaintiffs and the class would have achieved at trial").

In *Southwest Airlines*, 2013 WL 4510197 at *7, the court granted final approval to a class action settlement, observing: "The key factor in this particular case is that the proposed settlement calls for a full-value, one-to-one reimbursement . . . for class members. * * * [E]ven if plaintiffs faced few uncertainties in proving their

claims, the fact that they get back almost exactly what they lost weighs heavily in favor of approval of the proposed settlement." The same is true in this case.

It is also notable that some other class action settlements involving washing machines have *not* provided full reimbursement to class members. *See* docket no. 531-2 at 16-17 (describing a limited fund settlement involving Maytag washers, where the defendant "fund[ed] the settlement with a combination of cash and coupons," and further explaining that the defendant's "cash obligation was limited to $2 million, and claims exceeded that cap, resulting in reduced cash payment and instead coupons to purchase Maytag appliances"). The relief afforded to class members under the CCU Settlement Agreement is superior.

In sum, a comparison of the strength of the plaintiffs' case with the amount of the settlement obtained makes it clear that the CCU Settlement Agreement is, at the very least, fair, adequate, and reasonable. Furthermore, the Court has no concern that class counsel negotiated the settlement with the goal of "enrich[ing] themselves but giv[ing] scant reward to class members," especially in light of the fact that determination of the fee award has been left to the Court. *Thorogood*, 627 F.3d at 293. Injured class members are obtaining full relief regardless of how their counsel is eventually compensated. There is no sign that class counsel traded potentially greater class benefits for an increase in their own fees. The first *Synfuel* factor weighs decisively in favor of final approval.

### 2. *Complexity, Length, and Expense of Further Litigation.*

After nine years of litigation, this settlement will resolve the claims of all Kenmore-brand Class Washer owners nationwide, and all Whirlpool-brand Class Washer owners in California. Although the trial of claims made by Illinois class members was scheduled for July 2015, that trial would not have resolved the claims of class members in the remaining 49 states. Resolution of the claims for all class members would have taken many years. Further, there was a significant amount of work left to do even for the Illinois trial, including expert depositions, *Daubert* motions, trial preparation, and the multi-week trial itself. The history of this case suggests strongly that any jury verdict would be appealed by the losing side. The lodestar and expenses associated with trial of the Illinois class, itself, would have cost millions of dollars, not counting any appeal.

By contrast, the settlement provides immediate and certain relief to eligible members of the Settlement Class. Indeed, the settlement is likely the only viable avenue for Class Members to see *any* relief, given the economic realities of litigating claims of this nature. Moreover, the Settlement Agreement provides essentially *full* relief to eligible class members. Continuing to litigate the claims would needlessly entail significant risk and delay for the class without any realistic hope of a more favorable outcome.

This factor certainly weighs in favor of approval of the Settlement Agreement. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settle-

ment allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 3. *Amount of Opposition to the Settlement.*

Out of approximately 542,000 class members, only three objected to the settlement (*see* docket nos. 522, 561, & 562), and only 59 chose to opt out (*see* docket no. 571-5). The small number of class members who objected or opted out further supports the fairness and reasonableness of the settlement. *See Mangone*, 206 F.R.D. at 227 (statistics like these provide "strong circumstantial evidence supporting the fairness of the Settlement"); *Southwest Airlines*, 2013 WL 4510197 at *7 (finding that a similarly "low level of opposition supports the reasonableness of the settlement"). In addition, none of the State Attorneys General to whom notice was sent (pursuant to the Class Action Fairness Act) filed any objection to the Settlement Agreement. In other words, the amount of opposition to the Settlement has been minuscule.

Moreover, the three objections to the Settlement Agreement do not provide a valid basis for disapproval. All three objections raise the same, single issue—that is, that the three-year period within which a Class Member must have suffered a CCU Performance Problem, in order to be eligible for settlement benefits, is too short. As already noted, however, the three-year period is one year *longer* than the written warranties. It is highly likely this relief is far better than what any Class Member could have recovered at trial. Moreover, class counsel explains that the three-year eligibility period was "one of the most hotly contested aspects of the Settlement dur-

ing its negotiation." Docket no. 570 at 12. Both defendants and plaintiffs ultimately settled on the provision that a "Qualifying Repair" had to occur within three years of the Purchase Date because, to use class counsel's own words, "extensive investigation and factual development, including extensive expert analysis, [showed] that, as a matter of fact, the initial manifestation of the defect at issue in the case (*as opposed to ordinary failures unrelated to the defect*) would generally occur, if at all, within three years of purchase." Docket no. 570-1 at 3 (emphasis added); *see also* docket no. 571 at 17 (defendants' service data show that, "if a class member's Washer malfunctioned more than three years after purchase, *that problem likely was unrelated to the alleged defect at issue*") (emphasis added).

The three objectors are correct, or course, that a longer eligibility period would be better for plaintiffs, and that it is frustrating for a class member to "just miss" being eligible.[3] The relevant inquiry, however, "is not whether a better benefit could theoretically be provided, but whether the settlement is 'fair, adequate and free from collusion.'" *Browning v. Yahoo, Inc.*, 2007 WL 7105971 at *5 (N.D. Cal. Nov. 16, 2007) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)); *see Schulte*, 805 F. Supp. 2d at 595 (an objection "complaining that the settlement should be 'better,' . . . is not a valid objection"). "It is true that something could al-

---

[3] Although it appears that objector Meyers missed being eligible by about three months, because he incurred repair costs about 39 months after purchasing his Washer, objector Weyhaupt incurred repair costs five years after he purchased his Washer (*see* docket no. 522), and objector Gebhart asserts he began suffering CCU-related issues eight years after he purchased his washer (*see* docket no. 561). Of course, at some point, insisting on a lengthy eligibility period becomes entirely unreasonable – the life expectancy of a front-load washer is only about 10-12 years. The three-year period agreed to by the parties is ultimately rational and reasonable and fair, based on the law and facts of this case.

ways be added to every class action settlement to make it more favorable to class members, but that is not the standard by which class action settlements should be measured." *Mangone*, 206 F.R.D. at 227.

Except for the three-year eligibility period, no class member filed any opposition or objection to any *other* aspect of the Settlement Agreement – including its provisions regarding notice, the claims process, the amount of settlement benefits, the incentive awards, the potential amount of an attorney fee award, or the contested process for fee award determination. The objection regarding the three-year eligibility period does not undermine the conclusion that the Settlement Agreement, as a whole, is fair, reasonable, and adequate. Because there is essentially no valid opposition to the settlement, this factor also weighs in favor of final approval.

### 4. *Opinions of Counsel.*

"The opinion of competent counsel is relevant to determining whether a class action settlement is fair, reasonable, and adequate under Rule 23." *In re Capital One*, 80 F. Supp. 3d at 792 (citing *Synfuel*, 463 F.3d at 653); *see Meyenberg v. Exxon Mobil Corp.,* 2006 WL 5062697 at *5 (S.D. Ill. June 5, 2006) (placing "significant weight" on the strong endorsement of settlement by class counsel). The Court accepts that both plaintiffs' class counsel and defense counsel are highly experienced and competent attorneys; they all have excellent, national reputations, especially in the context of consumer class-action litigation. After spending nine years litigating this action, exhaustively evaluating the claims at issue, preparing for trial, and

then vigorously negotiating terms, counsel for both sides strongly support the settlement. Accordingly, this factor weighs in favor of approval.

### 5. Stage of the Proceedings; Amount of Discovery Completed.

The last factor the Court must consider is the stage of the proceedings and the amount of discovery completed. This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong*, 616 F.2d at 325.

Here, the parties engaged in dispositive motion practice, appellate practice, fact and expert discovery, and trial preparation. Defendants produced hundreds of thousands of pages of documents and multiple electronic databases, produced multiple witnesses for depositions, responded to written interrogatories, and provided several employees for deposition. Plaintiffs also produced documents and answers to interrogatories, and defendants took the named plaintiffs' depositions.

In the months leading up to settlement, the parties each disclosed comprehensive expert engineering reports. Counsel then exchanged a series of counter-proposals on key aspects of the settlement. After the essential terms of the Settlement Agreement had been reached, the parties continued to negotiate, but could not come to agreement on the amount of attorneys' fees and costs to be paid to class counsel; therefore, the parties agreed to leave that question for the Court.

It is clear that, at all times, both the litigation activity and the settlement negotiations were highly adversarial, non-collusive, and at arm's length. As a result, the parties and this Court are well positioned to assess the strength of this case and the

merits of plaintiffs' claims. Like the other four factors, this fifth factor favors final approval.

## V. CONCLUSION

The Court's analysis makes clear that final approval of the parties' settlement is appropriate. Accordingly, this Court grants the parties' joint motion for final approval of the CCU Settlement Agreement (docket no. 569). Specifically, the Court:

1. grants final approval of (a) the certification of the Settlement Classes, (b) designation of Plaintiffs Joseph Leonard, Kevin Barnes, Victor Matos, Alfred Blair, Martin Champion, Alan Jarashow, Lauren Crane, Lawrence L'Hommedieu, and Victoria Poulsen as the representatives of the Settlement Classes, and (c) designation of Class Counsel as counsel for the Settlement Classes, all as conditionally approved in the *Preliminary Approval Order*;

2. overrules the objections presented against approval of the Settlement Agreement;

3. grants final approval of the Settlement Agreement as fair, reasonable, and adequate to the Settlement Classes;

4. provides for the release of all Released Claims (as that term is defined in the Settlement Agreement Section I.BB and consistent with Section XI of the Settlement Agreement) and enjoins Settlement Class Members from asserting, filing, maintaining, or prosecuting any of the Released Claims in the future;

5.   orders the dismissal with prejudice of all CCU Claims alleged in the Sears Action and Whirlpool Action, and incorporates the releases and covenant not to sue stated in the Settlement Agreement, with each of the Parties to bear its, his, or her own costs and attorneys' fees, except as provided in Section X of the Settlement Agreement;

6.   authorizes the payment by Defendants of Valid Claims approved by the Settlement Administrator as Valid Claims, or otherwise reviewed by Class Counsel and counsel for Defendants and determined to be Valid Claims, in accordance with the terms of the Settlement Agreement; and

7.   without affecting the finality of this Order, retains exclusive jurisdiction over the Class Action and the Settlement Agreement, including the administration, interpretation, consummation, and enforcement of the Settlement Agreement. With the parties' joint consent, the Court specifically incorporates into this Order in full the parties' Settlement Agreement at docket no. 505-1, so that this Order may serve as an enforceable injunction. *See Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 489 (7th Cir. 2002); *Natkin v. Winfrey*, 2015 WL 8484511 at *2 (N.D. Ill. Dec. 8, 2015).

8.   orders that, as soon as practicable, the Parties shall file in the Whirlpool Action any filings necessary to terminate the *Poulsen* case.

9.   orders that the persons identified in "Exhibit 5" to defendants' memorandum in support of motion for settlement (docket no. 571-5) have timely and validly requested exclusion from the Settlement Classes and therefore are excluded

from the Settlement Classes and not bound by this Order, and may not make any claim or receive any benefit from the Settlement Agreement, whether monetary or otherwise. These excluded persons and entities may not pursue any Released Claims on behalf of those who are bound by this Order. Each Class member who has not requested to be excluded from the Settlement Classes, and is not listed in Exhibit A, is bound by this Order, and will remain forever bound.

10. orders that, as to the Released Claims, as defined in the Settlement Agreement, the Class Action and any and all currently pending class action lawsuits directly related to the subject matter of this litigation are dismissed with prejudice and in their entirety, on the merits, and, except as provided for in the Settlement Agreement, without costs. This dismissal shall not affect, in any way, any Class Member's right to pursue claims, if any, outside the scope of the Released Claims set forth in the Settlement Agreement.

11. orders that the Releasing Parties release, forever discharge, and covenant not to sue the Released Parties from and for Claims as set forth in the Settlement Agreement. The Releasing Parties are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any Released Claims released in the Settlement Agreement against any of the Released Parties, either indirectly, individually, representatively, derivatively, or in any other capacity, by whatever means, in any local, state,

or federal court, or in any agency or other authority or arbitral or other forum wherever located.

12. orders that this Order does not settle or compromise any other claims by Class Representatives or the Settlement Classes against the Defendants or other persons or entities other than Released Parties, and all rights against any other Defendant or other person or entity are specifically reserved.

13. pursuant to Fed. R. Civ. P. 54(b), directs entry of final judgment on all claims, counts, and causes of action related to the alleged CCU defect asserted by Plaintiffs, on behalf of themselves, the Settlement Class, or both. (Final judgment is not entered on any claims, counts, or causes of action related to the Biofilm defect asserted by Plaintiffs.) This Court specifically refers to and invokes the Full Faith and Credit Clause of the United States Constitution and the doctrine of comity, and requests that any court in any other jurisdiction reviewing, construing, or applying this Order implement and enforce its terms in their entirety.

**IT IS SO ORDERED.**

ENTER:

Dated: February 29, 2016

MARY M. ROWLAND
United States Magistrate Judge