# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **In re: SEARS, ROEBUCK AND CO. FRONT-LOADING WASHER PRODUCTS LIABILITY LITIGATION** | Case No. 06 C 7023 Consolidated with Case Nos. 07 C 0412 and 08 C 1832 |
| *This Document Relates to CCU Claims* | Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

This Court previously granted final approval to the parties' "CCU Settlement Agreement," which resolved certain claims brought against Sears and Whirlpool by purchasers of Kenmore- and Whirlpool-branded front load washing machines. Dkt. 590 (*Final Approval Order*). The *Final Approval Order* left open the question of class counsel's attorney fees and expenses. Dkt. 590 at 2.

The parties submitted numerous briefs and exhibits on the fee issue and also appeared for oral argument.[1] Having fully considered all of the parties' submissions, the Court concludes class counsel is entitled to: (1) a fee award in the amount of $4,770,834 and (2) reimbursement of expenses in the amount of $167,717. The Court orders Whirlpool to make these payments in accord with the provisions in Section X.F of the CCU Settlement Agreement. Dkt. 502-1 (S.A.) at 35–36 (discussing the timing of wire transfer of funds).

---

[1] The following docket entries relate to the attorney fee issue: 530–36, 564, 573–84, 587–88, 591.

# I. OVERVIEW

In 2001, Whirlpool began manufacturing front-load washing machines and selling them under its own brand. In 2005, Sears began to sell the same Whirlpool-manufactured machines under the Sears brand. When buyers began to experience problems, they filed lawsuits against both Whirlpool and Sears, asserting two types of defects: (1) the "biofilm defect," which caused mold and mildew to grow inside the machines; and (2) the "CCU defect," which caused the machines' central control unit to malfunction. The cases against Sears are all pending in this Court. The cases against Whirlpool were joined through multidistrict litigation and are all pending in the Northern District of Ohio. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 08-WP-65000, MDL No. 2001 (N.D. Ohio).

In 2015, after almost ten years of litigation, the parties in both the *Sears* and *Whirlpool* cases settled all claims. Rather than agree to a "Sears Settlement" and a "Whirlpool Settlement," however, the parties agreed to a "CCU Settlement" and a "Biofilm Settlement." The parties filed their CCU Settlement papers (resolving CCU claims against both Sears and Whirlpool) in this Court; they filed their Biofilm Settlement papers (resolving biofilm claims against both Sears and Whirlpool) in the MDL Court.

On February 29, 2016, this Court entered the *Final Approval Order* granting final approval to the CCU Class Action Settlement Agreement. In addition to setting out the settlement benefits defendants will pay to class members, the Settlement Agreement provides that defendants will pay attorney fees and costs to class coun-

sel and incentive awards to the named class members. Accordingly, class counsel moved for an award of attorney fees, reimbursement of expenses, and incentive awards for representative plaintiffs. Dkt. 530. Defendants object to the requested amounts of fees and expenses, but do not object to the requested amount of incentive awards. After hearing argument, the Court: (a) ordered an incentive award of $4,000 to be paid to each of the nine representative plaintiffs, for a total of $36,000; and (b) took the matter of fees and costs under advisement. Dkt. 590 at 2.

## II. PROCEDURAL HISTORY

On December 19, 2006, a group of five plaintiffs filed this action against Sears, complaining that the Kenmore-brand, front-load washers they had purchased from Sears suffered serious performance problems. After two other groups of plaintiffs filed similar lawsuits against Sears, the three cases were consolidated in this Court for pretrial purposes. Dkt. 36, 96. Just over two years later, on March 24, 2009, plaintiff Victoria Poulsen filed a similar action against Whirlpool in the U.S. District Court for the Eastern District of California. The MDL Panel transferred the *Poulsen* action to the *Whirlpool* multidistrict litigation in the Northern District of Ohio.

In 2011, this Court certified a class of all Illinois, Indiana, Kentucky, Minnesota, Texas, and California purchasers of the Kenmore-brand washers who suffered the alleged CCU defect. Dkt. 285. The Seventh Circuit upheld that ruling on appeal, but clarified that the class was properly certified only for liability proceedings, not for a determination of classwide damages. Sears vigorously opposed class certification

and stood its ground through several rounds (and years) of litigation. *See Butler v. Sears, Roebuck & Co.*, 702 F.3d 359 (7th Cir.), *rehearing and rehearing en banc denied* (7th Cir. 2012), *cert. granted, judgment vacated*, 133 S. Ct. 2268 (2013), *judgment reinstated, affirmed in relevant part*, 727 F.3d 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014). Having finally resolved the class certification issue, the parties and the Court agreed to conduct the first trial on behalf of the Illinois class only, which the Court scheduled for July 2015.

Two months before the scheduled trial, after all fact and expert discovery had been completed, the parties settled plaintiffs' CCU claims. Dkt. 483. For purposes of accomplishing the *nationwide* class settlement in this Court, plaintiffs amended the complaint solely to add Poulsen's California state claims. Dkt. 508 (Consolidated CCU Complaint). The Court then granted the parties' joint motion for final approval of the CCU Settlement on February 29, 2016. Dkt. 589, 590.

### III. THE CLAIMS AT ISSUE

The nine representative plaintiffs assert that Sears and Whirlpool sold them certain models of front-load washing machines that "had as component parts Matador 1 Central Control Unit (CCU) boards manufactured by Bitron . . . on a CEM-1 printed circuit board." Consolidated CCU Complaint ¶ 2. Plaintiffs allege these CCU circuit boards were defective, causing problems including "but not limited to, (a) premature and repeated mechanical failure; (b) stopping or not starting; (c) door remaining locked; and (d) displaying a variety of error codes such as F11 and FDL." *Id.* Plaintiffs' expert opined that the CCUs were defective because they were printed

on a material known as CEM-1, which is brittle, rather than a more flexible material such as CEM-3; when consumers operated the washers, normal vibrations stressed the brittle CEM-1 material, causing micro-fractures to the CCU's solder connections and breaking the electronic circuits. Dkt. 564-1 (report of plaintiffs' expert Michael Pecht). The consolidated complaint contains claims for breaches of express and implied warranty under state and federal law. Consolidated CCU Complaint ¶ 4. Plaintiffs assert these claims on behalf of two classes: (1) a nationwide class of owners of certain Sears Kenmore washers that contain the "Matador 1" CCU; and (2) a California class of owners of certain Whirlpool washers that contain the "Matador 1" CCU. *Id.* ¶ 55. These two classes include about 450,000 Kenmore washer owners and 86,500 Whirlpool washer owners.

## IV. THE SETTLEMENT AGREEMENT

The principal feature of the parties' CCU Settlement Agreement requires defendants to pay full monetary compensation to class members who suffered out-of-pocket expenses related to CCU performance problems. The Settlement Agreement also requires defendants to pay: (1) attorneys' fees to class counsel, (2) class counsels' litigation expenses, (3) incentive awards to the nine named plaintiffs, and (4) costs of settlement administration and class notice. In exchange, class members who do not opt out will release all of their CCU-based claims.[2]

---

[2] In the CCU Settlement, class members have not released any of their biofilm-based claims leaving them eligible to seek benefits under the MDL Court's biofilm settlement.

## A. The Settlement Classes

The Kenmore Settlement Class includes all persons who, while living in the United States, purchased or received as a gift a new Kenmore-brand, front-loading washing machine manufactured by Whirlpool between June 8, 2004, and February 28, 2006, with a Bitron-manufactured Matador 1 CCU. The washers are identifiable by specific model and serial numbers. S.A. at 6.

Similarly, the Whirlpool Settlement Class includes all persons who, while in the State of California, purchased or received as a gift a new Whirlpool-brand, front-loading washing machine manufactured by Whirlpool between May 25, 2004, and February 28, 2006, with a Bitron-manufactured Matador 1 CCU. These washers are also identifiable by specific model and serial numbers. S.A. at 11–12.

## B. Compensable Performance Problems

The Settlement Agreement provides monetary compensation for class members whose washers suffered certain "Performance Problems," and who suffered out-of-pocket losses to pay for "Qualifying Repairs."

The definition of a CCU-related Performance Problem is broad—it includes, *but is not limited to*, "(a) failure of the Washer to complete a cycle or interruption of the cycle; (b) failure of the door to lock at the start of the wash cycle or display of an FDL error code on the control console, or both; (c) failure of the door to unlock at the end of the wash cycle or display of an FDU error code on the control console, or both; (d) display of an F11 error code; and (e) service calls to repair or replace the CCU, the door lock assembly, the wire harness between the CCU and the MCU [Motor

Control Unit], the wire harness between the CCU and the door lock, or the MCU." S.A. at 7.

Compensation is available for "Qualifying Repairs," which essentially tracks the definition of Performance Problems. Thus, a "Qualifying Repair" means that "*within three years after the Purchase Date*: (1) a Service Technician repaired or replaced the Washer's CCU, or (2) a Settlement Class Member otherwise incurred documented out of pocket costs to repair the Washer due to the Washer's Performance Problem . . . , or (3) a Settlement Class Member replaced the Washer or otherwise took it out of service after contacting Whirlpool, Sears, an authorized Whirlpool or Sears retailer, or a Service Technician about a Performance Problem." S.A. at 8 (emphasis added). The three-year period exceeds the original manufacturer's warranty of one year for labor and two years for parts. Thus, the Settlement Agreement provides benefits in excess of defendants' written warranties.

## C. Amount of Compensation

Class members are entitled to compensation depending on the amount of repair costs they incurred and the proofs they submit. As a general matter, however, class members will receive a minimum of $150 for a valid claim. The Settlement Agreement contains no cap on the total amount that defendants may ultimately be required to pay for valid claims; nor is there a cap on how much an individual class member may receive. In other words, this is *not* a "common fund" or "limited fund" settlement. The compensation scheme is summarized below:

> ***Reimbursement for Paid Qualifying Repairs***: Class Members will receive the full amount of any documented costs for their First Paid

Repair for any Performance Problems within 3 years of purchase. If a Class Member can provide documentary proof for their First Paid Repair but the proof does not show the amount paid for that repair, that Class Members will receive $150. Class Members can also get additional compensation (on the same terms) for a Second Paid Repair if the repair took place less than 54 months after purchase.

***Reimbursement for Replacement***: Class Members who chose to replace, rather than repair, the Washer after contacting Whirlpool, Sears, or an Authorized Service Technician about a Performance Problem, will be reimbursed for the amount that the Class Member actually paid for the replacement (with sufficient documentary proof) up to $300.

***Compensation for Qualifying Service Contracts***: Class Members who purchased a warranty service contract will be reimbursed $100 to partially offset the cost of the service contract.

***Compensation for Excessive Repairs***: Class Members who had the CCU replaced by a Service Technician on three occasions within four years of purchase will receive the greater of (i) the purchase price of the Washer or (ii) the aggregate cost for the three repairs.

***Offsets***: The above compensation is subject to an offset if Whirlpool or Sears previously provided compensation to the Class Member such as a policy-adjust cash payment, a partial refund, a discount off the regular price of a new washer, a coupon applicable to the purchase of a new clothes washer that was redeemed, etc.

S.A. §§ IV.C–D.

At the time of the final approval hearing, the Claims Administrator reported that the average amount paid per valid claim was about $275. Dkt. 587 (Feb. 17, 2016 Hr'g Tr.) at 68.

## D. Notice and the Claims Process

When a consumer purchases a Sears washer, Sears usually collects point-of-purchase data, including the contact information for the consumer and the serial and model numbers of the purchased washer. To a lesser extent, Whirlpool collects similar information (mostly through warranty registration card returns). As a re-

sult, defendants know the specific identify of the vast majority of purchasers of the Kenmore washers at issue, and many of the Whirlpool washers at issue. Further, defendants often know whether class members complained about CCU-related problems because Sears' database indicates whether a purchaser of a Kenmore washer called with a complaint or to request a service call. This information allowed class notice to be more precise and allowed the claim submission process to be more streamlined.

The claims administrator used defendants' databases to send postcard notice to 486,387 individuals known to have purchased the washers at issue; he was also able to send 41,072 emails directly to class members. Dkt. 523-1 at 5. Whenever possible, class members were sent postcard notices that contained an individualized code; when the class member entered this code in the online claim form, many fields "auto-populated," making claim submission easier. And if a class member could "be identified in Whirlpool's or Sears's databases as having paid for a Qualifying Repair or as having paid for a Qualifying Service Contract," then he or she was deemed a "Prequalified Class Member." S.A. at 7. Prequalified Class Members were not required to submit *any* documentation to support their claims; to receive reimbursement for the amounts that Sears already knows the Prequalified Class Members paid, these class members need only confirm their current name and address, check the eligibility boxes on the online claim form, and submit their electronic signature. *Id.* at 20.

If a non-Prequalified Class Member did not provide necessary documentation of an out-of-pocket expense for a Qualifying Repair, the claims administrator would search defendants' databases for proof of a claimed Qualifying Repair, so that the claim might be cured and the class member would receive full reimbursement. S.A. at 21.

The Settlement Agreement makes clear that all costs of notice and claims administration are paid by defendants and do not reduce the amounts available to class members. S.A. § VI.

## E. Attorney Fees and Expenses

Defendants agreed to pay "reasonable attorneys' fees and costs," without reducing the amount of money available to pay benefits to class members, or fees to the settlement administrator, or incentive awards to the named plaintiffs. S.A. at 29, 35.[3] While the Settlement Agreement sets no minimum or maximum amounts within which a fee award must fall, class counsel agreed not to request more than $6 million.

## V. METHOD FOR DETERMINING REASONABLE ATTORNEYS' FEES

## A. State Law Versus Federal Law

The Settlement Agreement, resolving plaintiffs' warranty claims under the Magnuson Moss Act, 15 U.S.C. § 2301 et. seq, as well as state law warranty claims,

---

[3] The Settlement Agreement obligates defendants to pay incentive awards of $4,000 to each of the nine named plaintiffs. S.A. at 29. The Court approved these payments at the final approval hearing. Dkt. 589, 590.

provides that it "shall be construed and governed in accordance with federal procedural law and the substantive laws of the State of Illinois." S.A. at 43. While class counsel devote the majority of their brief addressing federal jurisprudence regarding fee requests, they also contend that the Court should apply Illinois law to the fee issue based on this provision in the Settlement Agreement. Dkt. 531 at 12–13. They then go on to assert that Illinois and federal courts essentially agree on how to determine a reasonable fee and the result will be the same regardless which law the court applies. *Id.* at 13–15.

In the Seventh Circuit, the "method of quantifying a reasonable fee is a procedural issue governed by federal law." *Oldenburg Group Inc. v. Frontier–Kemper Constructors, Inc.*, 597 F. Supp. 2d 842, 847 (E.D. Wis. 2009); *see Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004) (the procedure used to determine whether the amount sought is reasonable falls on the procedural side of the substantive-procedural divide created by *Erie* and subsequent decisions). Thus, the Court looks to federal precedent to determine the appropriate fees in this case. Given that the parties agree that plaintiffs are entitled to "reasonable" fees and the method of quantifying what is "reasonable" is a procedural issue, the Court will confine its analysis to federal law.

## B. Lodestar Versus Ratio Approach

The district court plays a significant role in reviewing class action settlements and determining appropriate fee awards to class counsel. In non-class action cases, the trial court trusts that the parties "have negotiated to a just result as an alterna-

tive to bearing the risks and costs of litigation." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). But when reviewing a class action settlement, "the law quite rightly requires more than a judicial rubber stamp" because of "the built-in conflict of interest in class action suits." *Id.*; *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 711 (7th Cir. 2015) ("conflicts of interest are inherent in class action suits"). Naturally, the defendant "is interested only in . . . how much the settlement will cost him." *Redman*, 768 F.3d at 629. According to the appellate court, "class counsel, as 'economic man' . . . is interested primarily in the size of the attorneys' fees." *Id.* Assuming both counsel are self-interested, "the optimal settlement . . . is therefore a sum of money moderate in amount but weighted in favor of attorneys' fees for class counsel." *Id.*; *see Southwest Airlines*, 799 F.3d at 711 (review of fee requests must be "based on the assumption that class counsel [will] behave as economically rational actors who seek to serve their own interests first and foremost")

In order to address this inherit conflict of interest, the *Redman* court set forth a ratio to assess the reasonableness of a fee request, namely, "the ratio of (1) the fee to (2) the fee plus what the class members received." 768 F.3d at 630. Two months later, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014), emphasized the *presumption* "that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." Both *Redman* and *Pearson* addressed several factors that the district court should consider in calculating this ratio to determine the *actual* value of the settle-

ment to class members. Thus in *Redman*, the court held that the settlement value to the class could not include the $2.2 million in administrative costs as those costs did not represent a value received by the members of the class. 768 F.3d at 630. Similarly in *Pearson*, the settlement value to the class members could not include the $1.5 million for the cost of notice to the class or the $1.13 million *cy pres* award. 772 F.3d at 781, 784. Also, the settlement value was limited to the $865,284 actually paid to the class members, not the potential $14.2 million if every one of the 4 million class members had filed a claim. *Id.* at 780–81.

Relying on *Pearson* and *Redman*, defendants argue that the Court *must* confine its award to "the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 630; *accord Pearson*, 772 F.3d at 781; *see* Dkt. 564 at 11–13. In light of the claims pending at the time of the final fairness hearing, strictly applying this ratio would limit the fee award to approximately $900,000. Hr'g Tr. at 64. This is over $2 million less than the value of the time plaintiffs' counsel actually expended over the nine years this case was in litigation.

This Court believes defendants read *Pearson* and *Redman* too broadly. The objectors in *Southwest Airlines*, a coupon settlement, relying on the *Pearson* presumption argued that the fee "had to be based on the value of the coupons actually redeemed by class members." 799 F.3d at 705. The Seventh Circuit rejected this argument, ruling that "a district court [has] discretion to use the lodestar method to calculate attorney fees even when those fees are intended to compensate class counsel for the coupon relief he or she obtained for the class." *Id.* at 707. Indeed, whether

attorneys' fees in class action cases are based on statutory fee-shifting or the common fund doctrine, the district court can use the lodestar method to calculate the fees.[4] *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) ("The 'lodestar' figure has . . . become the guiding light of our fee-shifting jurisprudence. We have established a 'strong presumption' that the lodestar represents the 'reasonable' fee . . . ."); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) ("in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court"); *Kolinek v. Walgreen Co.*, No. 2015 WL 7450759, at *15 (N.D. Ill. Nov. 23, 2015) ("In the Seventh Circuit, district courts may exercise discretion in choosing either the lodestar or percentage-of-the-fund approach to calculating attorney's fees in common-fund cases. The Seventh Circuit is agnostic regarding which approach district courts should choose . . . .") (citation omitted); *Reid v. Unilever United States, Inc.*, No. 12 C 6058, 2015 WL 3653318, at *5 (N.D. Ill. June 10, 2015), *aff'd sub nom. Martin v. Reid*, 818 F.3d 302 (7th Cir. 2016) ("In a statutory fee-shifting case, the court determines a reasonable amount of attorneys' fees by applying the lodestar method."). The *Southwest Airlines* court cautioned the court applying the lodestar method to "bear in mind the potential for abuse" but was persuaded that this was "an exceptional settlement that actually makes the class whole." 799 F.3d at 710–12.

---

[4] Here, plaintiffs brought a class action against defendants under both the Magnuson-Moss Warranty Act, which contains a fee-shifting provision, and various state-law warranty statutes, which do not. The parties do not discuss whether the common fund doctrine or statutory fee-shifting applies to their dispute. Under either scenario, however, the Court can apply a lodestar analysis.

The present case was hard-fought over nearly ten years—including two appearances before the Seventh Circuit on class certification. Furthermore, qualified members of the class are receiving on average $275, nearly all the money they spent repairing or replacing their faulty washer. In light of the *Southwest Airlines* holding, the Court rejects the notion that it is precluded from awarding the lodestar. The *Pearson* presumption is exactly that—a presumption that may be overcome. *See Pearson*, 772 F.3d at 782 ("the *presumption* should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel") (emphasis added).

Although the Court finds that it is not bound by the *Pearson* ratio presumption, there is no doubt the Court is obligated to carefully review the settlement for indications of class counsel being compensated at the expense of the class members. The Seventh Circuit has identified a number of factors for the district court to consider when evaluating whether attorney fees for class counsel are being sought at class expense. Not a single one of them is present in this case.

First, the district court should be wary if the settlement agreement includes a "clear-sailing clause"—"a clause in which the defendant agrees not to contest class counsel's request for attorneys' fees." *Redman*, 768 F.3d at 637. The concern is that a defendant likely would not agree to a clear-sailing clause without some concession by class counsel—"namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class counsel are likely to consider." *Id.* While clear-sailing clauses are not unlawful per se, "such a clause should be sub-

jected to intense critical scrutiny by the district court." *Id.* As evidenced by the volume of pleadings filed in this case regarding the attorneys' fees, the parties have no "clear sailing" agreement.

The district court should also be suspicious of a "kicker clause," which "provides that if the judge reduces the amount of fees that the proposed settlement awards to class counsel, the savings shall inure not to the class but to the defendant." *Pearson*, 772 F.3d at 786. Describing the kicker clause as a "gimmick for defeating objectors," the circuit court observed that the obvious benefit of a kicker clause to the *defendant* is matched by a hidden benefit to *class counsel*—counsel are more likely to get the agreed-upon fee award, because no class member has "standing to object." *Id.*; *see Southwest Airlines*, 799 F.3d at 705 ("'kicker' clauses [are] designed to shield the fee award from challenge"). Again, there is no "kicker" clause here.

Finally, the *Pearson* court was concerned that the claims process actually discouraged claims from being filed. As the *Pearson* court observed, the ratio presumption "gives class counsel an incentive to design the claims process in such a way as will maximize the settlement benefits actually received by the class." 772 F.3d at 781. Troubling to the court in *Pearson* was the fact that, for a modest award of $3 or $5 per bottle purchased, a class member had to wade through five documents on a website, provide proof of purchase ("likely to have been discarded"), and certify under penalty of perjury the veracity of his claim. *Id.* at 783. To the contrary, in the present case, the claims process was designed to maximize claims. Whenever possible, class members were sent postcard notices that contained an individualized

code; when the class member entered this code in the online claim form, many fields "auto-populated," making claim submission easier. And if a class member was "identified in Whirlpool's or Sears's databases as having paid for a Qualifying Repair or . . . a Qualifying Service Contract," then he or she was deemed a "Prequalified Class Member." S.A. at 7. Prequalified Class Members were not required to submit *any* documentation to support their claims. These class members need only confirm their current name and address, check the eligibility boxes on the online claim form, and submit their electronic signature. *Id.* at 20. Finally, defendants also agreed that if a non-Prequalified Class Member did not provide necessary documentation of an out-of-pocket expense for a Qualifying Repair, the claims administrator would search defendants' databases for proof of a claimed Qualifying Repair, so that the claim might be cured and the class member would receive full reimbursement. *Id.* at 21. As a result, the claim submission rate in this case is high. Although "the percentage of class members who file claims is often quite low" in consumer class actions, *Pearson*, 772 F.3d at 782 (noting it was "one quarter of one percent" in that case), the claim submission rate for prequalified claimants in this case is about 16%. Dkt. 574 (Schwartz Decl. in Support of Reply) at ¶ 1.

In this case, there is no evidence of collusion between defendants and class counsel. The Settlement Agreement contains no kicker or clear-sailing clauses. Further, the parties agreed on the class members' settlement without discussing attorney fees. Dkt. 574 at ¶ 7 (class counsel attesting that the parties agreed on class relief without any agreement on fees). "There was not a single cent of relief that [the]

class traded off for fees." Hr'g Tr. at 42; *see* S.A. §§ X.A (agreeing to pay fees "without reducing the amount [of] money available to pay Valid Claims submitted by Settlement Class Members"), X.D (same), X.B ("The amount of attorneys' fees and expenses to be paid to Class Counsel shall be determined by the Court."). And defendants are vigorously contesting class counsel's fees request. *Cf. Redman*, 768 F.3d at 629 (rejecting class settlement partly out of concern that defendant agreed to not contest $1 million in fees in exchange for smaller award to class).

Second and most significantly, qualified class members are receiving a full recovery.[5] Hr'g Tr. at 39; *see Southwest Airlines*, 799 F.3d at 711 (emphasizing that "complete relief for the class is the model of an adequate settlement"). Both parties attest that the Settlement Agreement provides class members with a "full, make-whole relief for repairs (and significant compensation for washer replacements) related to CCU Performance Problems that first manifested within 3 years of purchase."[6] Dkt. 502 at ¶ 12 (joint declaration by defendants and class counsel). The parties agree that class members are enjoying a "substantial recovery," "since the original manufacturer's warranty was limited to one year for labor and 2 years for parts." *Id.*

---

[5] It is worth noting that there were no objections filed to the fees requested despite the fact that class counsel filed their motion for fees, Dkt. 530, a month before objections were due. *Cf. Redman*, 768 F.3d at 637 (criticizing settlement because class counsel filed fees motion *after* the deadline set for objections had expired). The only objections to the Settlement Agreement were to the three-year limitations period. Dkt. 522, 561, 562. The Court overruled these objections. Dkt. 590 at 25 ("[T]he three-year period is one year *longer* than the written warranties. It is highly likely this relief is far better than what any Class Member could have recovered at trial.").

[6] Discovery in this case confirmed that "a significant percentage of CCU Performance Problems manifested within the first 3 years of service." *Id.*

Third, the lawyers did not rush this case to settlement in order to maximize class counsel's fees. In *Redman*, the parties settled less than two years after the case was filed and before any substantive motions had been decided, yet agreed to award class counsel $1 million in fees. 768 F.3d at 627–28. There was no "genuine adverseness between the parties rather than the conflict of interest recognized and discussed in many previous class action cases, and present in this case." *Id.* at 629. Similarly, in *Pearson*, the parties settled eight months after filing and agreed that defendants would not oppose plaintiffs' counsel's fee request of $4.5 million. 772 F.3d at 779–81. Here, to the contrary, settlement was achieved after *nine years* of litigation. Thus, the fees sought here are not the result of a quick settlement to maximize an economic windfall but instead are the result of intense advocacy on both sides. In sum, there are no factors suggesting "collusion . . . between class counsel and the defendant, to the detriment of the class members." *Redman*, 768 F.3d at 637.

Having concluded that Class Counsel's fee should be determined based on the lodestar, the Court now turns to determinate what their compensation should be.

## VI. LODESTAR ANALYSIS

As the party seeking the award of attorneys' fees, plaintiffs "bear[] the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *accord Reid*, 2015 WL 3653318, at *6 ("As the party seeking the award of attorneys' fees, Plaintiffs bear the burden of establishing the reasonableness of the time expended

and hourly rates charged by their attorneys."). The lodestar method results from "multiplying a reasonable hourly rate by the number of hours reasonably expended on the litigation." *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001); *accord Reid*, 2015 WL 3653318, at *6.

Counsel asserts that they spent 6,133.85 hours litigating the CCU claims through February 4, 2016, the date they filed their Reply, with a resulting lodestar of $3,249,640.[7] In addition, class counsel argues that the Court should award a 1.85 multiplier, for a total fees award of $6 million.[8] Dkt. 531 at 22; Dkt. 573 at 51 & n.35.

---

[7] The CCU related lodestars for each of the plaintiffs' firms breaks down as follows:

| Firm | Hours | Lodestar |
|---|---|---|
| Carey, Danis & Lowe | 2428.6 | $1,210,490 |
| Chimicles & Tiklellis LLP | 3037.9 | $1,635,139 |
| Lieff Cabraser Heimann & Bernstein, LLP | 253.95 | $156,592 |
| Quantum Legal LLC | 302.1 | $178,809 |
| Seeger Weiss LLP | 56.3 | $29,617 |
| Shepherd, Finkleman, Miller & Shaw, LLP | 55.0 | $38,993 |
| **Total** | **6133.85** | **$3,249,640** |

Dkt. 531, Ex. 1. In their Reply, class counsel (1) subtracted seven hours that were actually biofilm time; (2) shifted $30,310 that Leiff Cabraser paid for appellate legal specialists from expenses to their lodestar; (3) increased Carey Danis' lodestar by $20,000 for time spent by co-lead counsel James Rosemergy with claims administration and final approval issues; and (4) increased Chimicles & Tiklellis' lodestar by $44,000 for time spent by co-lead counsel Steven Schwartz with claims administration and final approval issues. Dkt. 573 at 51 n.35, 53; Dkt. 574 at ¶¶ 17–18; Dkt. 575 at ¶¶ 8, 12 & Ex. 1. All these changes are reflected in the above chart. Defendants have not objected to any of these changes. Dkt. 584.

[8] Class counsel originally requested a 1.9 multiplier. Dkt. 531 at 22. However, in their Reply, they reduced their request to 1.85 because their lodestar had increased by almost $100,000, and they agreed not to seek more than $6 million in fees. Dkt. 573 at 51 & n.35.

## A. Class Counsel's Hours

The Supreme Court has directed that "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. It is well-settled that "if the prevailing party fails to exercise the proper billing judgment, the court should exclude from the fee calculation hours that were not 'reasonably expended.'" *Reid*, 2015 WL 3653318, at *7 (citing *Hensley*, 461 U.S. at 434).

Defendants "do not challenge Class Counsel's lodestar on the basis of the total number of hours Class Counsel claim to have spent on the litigation as a whole or on particular tasks." Dkt. 564 at 40. However, defendants argue that the Court should: (1) reduce the base lodestar for any biofilm-related work; (2) disallow the single, non-contemporaneous, cumulative billing entry of 1,047 hours totaling $314,100; and (3) disallow Shepherd Finkelman's time because its records are so heavily redacted. Dkt. 564 at 26–41. The Court addresses each of defendants' arguments in turn.

### 1. Biofilm-Related Work

Defendants argue that work "on the biofilm claims should [not] be compensated as part of this CCU settlement, especially because Class Counsel intend to request reimbursement of fees and costs in the separate biofilm class settlement." Dkt. 564 at 36. The Court agrees that work performed on the biofilm litigation should not be

compensated here. Defendants' concern arises because prior to April 2014, the CCU claims were litigated together with the related biofilm claims. Dkt. 347 (severing CCU claims for trial purposes). "Documents were produced into a common database, legal issues were tried together in single briefs, and several depositions applied to all claims." Dkt. 531 at 25. Nevertheless, class counsel asserts that "[o]nly CCU-centric time is included in the lodestar" presented in their motion. *Id.* Co-lead counsel, James Rosemergy, personally reviewed "both his firm's entries and the time entries of other firms" and compared them against "the case file and docket to ensure that the time being submitted was, in fact, related to CCU in particular." Dkt. 573 at 41; Dkt. 575 at ¶¶ 4–5. Further, class counsel assured the Court that regardless of the Court's ruling here, none of the fees submitted in this case were submitted in the biofilm fees request.[9] Dkt. 587 at 45–47. The Court agrees with defendants position, but believe class counsel has generally been diligent in only seeking compensation for CCU related hours.

### a. *Lieff Cabraser Appellate Time*

Defendants specifically challenge Lieff Cabreser's request for $109,507.75 in fees for work that its attorneys performed on the class certification appeals. Dkt. 564 at 27–28; *see* Dkt. 531-12 at ¶ 7. Lieff Cabraser, the primary appellate counsel, represented plaintiffs in the Seventh Circuit in the *Kenmore* litigation *and* in the Sixth Circuit in the *Whirlpool* litigation. Dkt. 531-12 at ¶ 5. It was also primary counsel during the two rounds of certiorari briefing in the United States Supreme Court in

---

[9] It is worth noting that the CCU lodestar is less than 10% of the biofilm lodestar. Dkt. 573 at 35; Dkt. 574 at ¶ 5; Dkt. 586 at 5 (sealed term sheet).

both cases. *Id.* It also handled the appellate work after a biofilm matter was tried in the Ohio district court. The total time spent on this combined appellate work was 887.8 hours with a total lodestar of $438,031. *Id.* at ¶¶ 5–7. Because it was "not possible to precisely attribute the time expended on the appellate work across the *Kenmore* and *Whirlpool* cases in the Courts of Appeal and Supreme Court as between those cases," Lieff Cabraser determined that "approximately 25% of LCHB's hours and lodestar are reasonably and appropriately apportioned to the CCU litigation." *Id.* at ¶ 5(b). That resulted in 221.95 hours and $109,507.75 apportioned to this litigation. *Id.* at ¶¶ 5(b), 7.

After reviewing Lieff Cabraser's time entries, the Court is concerned with the large number of time entries in 2014 and 2015, Dkt. 564-5 at 91–94, which occurred after the appellate work concluded in this case and the parallel appellate work concluded in the *Whirlpool* cases. *See Whirlpool Corp. v. Glazer*, 2013 WL 6493514 (U.S.) (filing joint brief in opposition to certiorari in both the *Kenmore* and *Whirlpool* cases); *Sears, Roebuck & Co. v. Butler*, 134 S. Ct. 1277 (Feb. 24, 2014) (denying certiorari); *Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014) (same). The 2014–2015 hours, on the other hand, were devoted to only biofilm work. The Court therefore disallows this time—568.3 hours with a lodestar of $263,081.50—from Lieff Cabraser's combined CCU/biofilm time.[10] The allowable time is decreased to 319.5 billable hours with a lodestar of $174,949.50.

---

[10] This deletes all time for billers Richard Anthony, Elizabeth Cabreser, Todd Carnam, Jordan Elias, Spencer Griffith, Jerome Mayer-Cantu, Kathryn Murray, and Jennifer Rud-

However, because the Court has discounted all 2014–2015 time, the Court finds that 50% of the remaining time is reasonably allocated to Lieff Cabraser's contribution to the CCU settlement. Accordingly, the adjusted lodestar for Lieff Cabreser's appellate work is $117,785—50% of the combined CCU/biofilm lodestar ($87,475) plus the amount paid to appellate legal specialists ($30,310), which the parties agreed to transfer from expenses to the lodestar.[11] Dkt. 573 at 53; *accord* Dkt. 584 at 24.

This finding is amply supported by the amount of time defendants spent on CCU appellate work. Mayer Brown handled the appellate litigation for defendants. After conceding that it is difficult and time-consuming to separate appellate counsel's CCU and biofilm time, defendants assert "[o]nly a small percentage of its work was CCU-related." Defendants went on to stipulate, in the interest of compromise, "that $200,000 of Mayer Brown's work charged . . . was CCU-related, but that is an over-statement of MB's time that could be reasonably attributed to the CCU claims." Dkt. 574, Ex. B. This might be an over-estimate, but it is nearly twice what Lieff Cabreser is awarded for its appellate work.

### b. *Carey Danis*

Defendants also challenge the law firm Carey Danis' claim for $7,962.50 worth of time spent on witness Chowanec's 2015 deposition, which covered both biofilm and

---

nick, and 59.3 hours from biller Jason Lichtman and 24.8 hours from biller Jonathan Selbin. Dkt. 564-5 at 91–94.

[11] In addition to Lieff Cabraser's appellate work, the firm devoted 32 hours to work specifically on the CCU district court litigation. Dkt. 531-12 at ¶¶ 6–7. The Court's consideration of these hours is discussed below.

CCU issues. Dkt. 564 at 23 n.10. Plaintiffs agree that the deposition did cover both issues, but assert "the time submitted for this fee petition reflects a proper allocation between the two claims." Dkt. 573 at 39. Mark Chalos of Lieff Cabraser questioned Chowanec on the biofilm issue, and Lieff Cabreser's Chowanec-related time is not being submitted in this fee application. *Id.*; Dkt. 575 at ¶ 6. On the other hand, Mr. Rosemergy of Carey Danis handled the CCU portion of the Chowanec deposition, and his time is properly compensable. *Id.* Defendants' objections to the time spent by Carey Danis on the Chowanec deposition are overruled.

### 2. *Carey Danis Document Review Entry*

Class Counsel's fee request included a single time entry for 1,047 hours of document review during the period of April 2014 through March 2015 for a lodestar amount of $314,100. Dkt. 564, Ex. 5 at 82. Defendants rightly object because "no client paying by the hour would pay $314,100 based on a single, vague entry covering 11 months of work." Dkt. 564 at 29; *see Hensley*, 461 U.S. at 434 ("Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* . . . .") (citation omitted) (emphasis in original); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) (party seeking fees must provide "the level of detail that paying clients find satisfactory"); *Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 986 (N.D. Ill. 2012) ("The relevant inquiry is thus whether the time entries are sufficiently detailed to permit the Court to determine whether the hours expended were reasonable and necessary to the conduct of the litigation.") (citation omitted). Defendants also assert that "the entry violates the Supreme Court's requirement

that time entries be accurately kept." Dkt. 564 at 30; *see Hensley*, 461 U.S. at 433 & 438 n.13 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Hardrick v. Airway Freight Sys., Inc.*, No. 98 C 1609, 2000 WL 263687, at *3 (N.D. Ill. Feb. 28, 2000) ("The 'primary concern' of the *Hensley* decision is 'that the entries made were *accurate*,' and based on 'contemporaneous records.'") (quoting *Dutchak v. Central States Pension Fund,* 932 F.2d 591, 597 (7th Cir. 1991)) (emphasis in original).

Class counsel replied that while the work was memorialized "in distinct entries that are identified by date and amount of time worked," they produced a block entry so as not to "unnecessarily burden" the process. Dkt. 573 at 40. Class counsel then provided "out of an abundance of caution" a complete set of daily time entries. Dkt. 575 at ¶ 10; Dkt. 580-3. According to co-lead counsel Rosemergy, the $314,100 charge was for a second-level document review done on CCU documents only *after* the documents had been segregated between CCU and biofilm. Dkt. 573 at 41; Dkt. 575 at ¶ 10. Defendants maintain that the newly produced time entries are still insufficient because they merely describe the work as "document review." Dkt. 584 at 15.

Assured that the documents are CCU related, the Court is not troubled that the Carey Danis' "document review" entries are too vague. Clients and the Court are well aware of what "document review" entails without further edification. Defendants question the timing of performing document review in 2014 and 2015 for doc-

uments produced in 2010–2011. Dkt. 564 at 29–30; *see* Dkt. 584 at 15. But the second-level document review was performed only after the case had been remanded to the district court, and class counsel was certain they had a viable class. *See* Dkt. 573 at 40; Dkt. 575 at ¶ 3. This strikes the Court as efficient rather than objectionable time management.

However, defendants also assert that the bulk of this 1,047 hours of document review (six months, full-time work) was spent in the months leading up to the October 2014 biofilm trial in Ohio when no deposition activity was taking place in CCU. Dkt. 584 at 15. Further, all of this document review was done in preparation for two CCU depositions and to prepare for the CCU trial. The Court finds this time excessive and decreases the allowable time to 800 billable hours.

### 3. *Shepherd Finkelman's and Quantum Legal's Time Entries*

In their motion, class counsel admits that Shepherd Finkelman "did not segregate time spent . . . between activities devoted to the portion of the case pertaining to control board issues [CCU] as opposed to biofilm issues" and was able to identify only ".80 hours that clearly was related to control board issues." Dkt. 531, Ex. 13 at ¶ 6. In their reply brief they identified another .80 hours that was "clearly related" to CCU issues. *Id*. Nevertheless, Shepherd Finkelman claims $38,993 in fees. *Id*. at ¶ 5. Defendants contend that this request is "improper" and further complain that the time records tendered by Shepherd Finkelman are "so heavily redacted that it is impossible to determine which, if any, entries pertain to the CCU claims." Dkt. 564 at 30; *see Reid*, 2015 WL 3653318, at *8 ("Where attorneys' time entries are so re-

dacted that it is difficult if not impossible for a court to sufficiently evaluate the services rendered and fees charged, and results in the exclusion of basic material information which undermines the integrity of the entire petition, the court may disallow those entries.") (citation omitted); *see also Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000) ("when a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage").

In reply, class counsel contend that (1) detailed time records were provided to defendants and (2) almost all of Shepherd Finkelman's time was spent in connection with "litigating the related Whirlpool-*Poulsen* matter, which relates solely to issues pertaining to CCU (rather than mold)." Dkt. 573 at 42. At the hearing on February 17, 2016, plaintiffs suggested submitting unredacted billing records to the Special Master. Without objection from defendants, the Court ordered those records to be submitted by February 24, 2016. Dkt. 585. The Court has reviewed the unredacted time entries and finds that they are sufficiently detailed for the Court to evaluate the services rendered. The bulk of the time was spent preparing a response to the motion to dismiss in the *Poulsen* case, a CCU-only matter. The Court therefore finds that the hours spent on the tasks identified were reasonably spent. Defendants' objections to the hours claimed by Shepherd Finkelman are overruled.[12]

---

[12] Although it was without objection, the Court likely erred in allowing Shepherd Finkelman to submit time records for *in camera* review. *See Reynolds v. Beneficial Nat. Bank,* 288 F.3d 277, 286 (7th Cir. 2002) ("[W]e disapprove the practice . . . of . . . permitting

Defendants also questioned 13 of Quantum Legal's time entries, totaling $6,543.50, because they provided no description whatsoever. Dkt. 564 at 31 & Ex. 5 at 84, 87–88. Plaintiffs acknowledged this oversight and provided corrected versions of these time entries, which now include descriptions. Dkt. 573 at 42. The Court has reviewed these entries and finds them reasonable.[13]

## B. Class Counsel's Hourly Rates

A "reasonable hourly rate" is "one that is derived from the market rate for the services rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (citation omitted). Thus, "an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." *Id.* If an attorney has no fee-paying clients because he uses contingent-fee arrangements, the "next best evidence" of the attorney's market rate is "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999). Of these two alternatives, the Seventh Circuit prefers "third party affidavits that attest to the billing rates of comparable attorneys."

---

the submission of fee applications *in camera*. In the unlikely event that some confidential information is contained in the applications, that information can be whited out. To conceal the applications and in particular their bottom line paralyzes objectors . . . ."). Having reviewed the records, there was no basis to have them reviewed *in camera*. However, this is moot since counsel at Shepherd Finkelman—Betsy Ferling-Hitriz, James C. Shah and Natalie F. Bennett—provided *no* information justifying their requested hourly rates, so the Court disallows them recovery on that basis. *See infra* § VI.B.1.

[13] This is moot since counsel who performed these tasks at Quantum Legal—Paul Cho, George Lang, Michael Lotus, Julie Miller, and Paul Weiss—provided *no* information justifying their requested hourly rates, so the Court disallows them recovery on that basis. *See infra* § VI.B.1.

*Pickett,* 664 F.3d at 640. "The fee applicant bears the burden of producing satisfac-tory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Id.* (citation and alteration omitted). Once that burden is satisfied, the burden shifts to the other party "to pre-sent evidence establishing a good reason why a lower rate is essential." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1313 (7th Cir. 1996). "If the party seeking fees fails to carry its burden, the Court may properly 'make its own determination of a reasonable rate.'" *Reid*, 2015 WL 3653318, at *14 (quoting *Pickett,* 664 F.3d at 640).

### 1. *Unsupported Hourly Rates*

In their sur-reply, defendants argue that class counsel has failed to provide any biographical information for several billing attorneys from Lieff Cabraser, Seeger Weiss, Shepherd Finkelman, and Quantum Legal.[14] Dkt. 584 at 16. Defendants ar-gue that "the Court should disallow any time claimed by attorneys for whom Class Counsel have not provided any information." Dkt. 584 at 17. The Court generally agrees, especially since class counsel had the opportunity in their reply to remedy any oversight and failed to do so. *See Montanez v. Chicago Police Officers Fico (Star No. 6284), Simon (Star No. 16497)*, 931 F. Supp. 2d 869, 879 (N.D. Ill. 2013), *aff'd sub nom. Montanez v. Simon*, 755 F.3d 547 (7th Cir. 2014) (disallowing attorney time in the "absence of any information" on skill or experience); *see also O'Sullivan v. City of Chicago,* 484 F. Supp. 2d 829, 839–40 (N.D. Ill. 2007) (disallowing time for

---

[14] This is even after class counsel provided biographical data on seven billers in their *re-ply* brief. Dkt. 575-5; Dkt. 575-7; Dkt. 576-2; *accord* Dkt. 584 at 16, 20–21.

attorney who provided little information other than his hourly rate). However, where the Court can determine that the biller is a paralegal, legal assistant or other support staff, the Court will, as described below, "make its own determination of a reasonable rate." *Pickett,* 664 F.3d at 640. Thus, the Court disallows all time claimed for Natalie Bennett, Paul Cho, Kimberly Evans, Betsy Ferling-Hitriz, George Lang, Michael Lotus, Julie Miller, Kathryn Murray, Stephanie Saunders, Miriam Schimmel, James Shah, Darsana Srinivasan, and Paul Weiss.[15]

### 2. *Supported Hourly Rates*[16]

#### a. *Jason Lichtman and Jonathan Selbin*

As discussed above, Lieff Cabraser submitted 32 hours for work specifically performed on the CCU litigation alone. Dkt. 531-12 at ¶¶ 6–7. Class counsel seeks a $800 rate for Selbin and a $515 hourly rate for Lichtman, partners with Lieff Cabraser with 9 and 23 years of experience, respectively. Dkt. 531-12 at ¶ 7; Dkt. 575-5 at 101–02, 114. Defendants argue that Selbin's rate should be reduced to $540 and Lichtman's to $346. Dkt. 564 at 37.

Selbin and Lichtman have practiced in numerous federal courts and authored multiple articles. Dkt. 575-5 at 101-02, 114. In support of their hourly rates, Licht-

---

[15] While class counsel also failed to provide any biographical information for Lieff Cabraser appellate billers Richard Anthony, Todd Carnam, Jordan Elias, Spencer Griffith, Jerome Mayer-Cantu, Jennifer Rudnick, Jle Tarpeh, Gregory Waskiewicz, and Allen Wong, the Court has determined the appropriate CCU appellate lodestar for Lieff Cabraser in the aggregate. *See supra* § VI.A.1.a.

[16] The Court notes that the hourly rates it finds supported are all less than those approved recently in *Abbott v. Lockheed Martin Corp.*, No. 06 CV 701, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015).

man asserts that these specific rates have been "expressly approved" by multiple courts throughout the United States, including the Northern District of Illinois. Dkt. 531-12 at ¶ 9. Lichtman supports his declaration with citations to over 20 cases where courts had approved the standard billing rates submitted in this case. *Id.* a ¶ 9(a)–(u). The Court finds that Lichtman and Selbin have met their burden to establish that their rates are in line with those prevailing in the community.

### b. *Stephen Weiss, Jonathan Shub, and Scott George*

Class counsel seeks an $850 hourly rate for Weiss and a $750 hourly rate for Shub, partners with Seeger Weiss with 24 and 27 years of experience, respectively. Dkt. 576-1; Dkt. 576-2 at 28, 30. Class counsel seeks a $650 rate for George, who is of counsel with Seeger Weiss and has 17 years of experience. Dkt. 576-2 at 32. Defendants express no opinion on Weiss's rate but argue that Shub's rate should be reduced to $528 and George's to $458. Dkt. 564 at 37.

Weiss and Shub have practiced in numerous federal courts and authored multiple articles; George's practice focuses on class action litigation. Dkt. 576-2 at 28, 30, 32. In support of their hourly rates, Weiss asserts that these "usual and customary hourly rates . . . have been reviewed and deemed reasonable" by multiple federal courts. Dkt. 576 at ¶¶ 2, 5–6; *see* Dkt. 531-14 at ¶ 5. For example, the Central District of California has recently approved a $750 hourly rate for Seeger Weiss partners and a $595 rate for Seeger Weiss counsel.[17] Dkt. 576 at ¶ 6 (citing *Aarons v.*

---

[17] According to the Consumer Law Report, which defendants submitted in support of their proposed rates, billing rates for Los Angeles attorneys are generally comparable to rates for Chicago attorneys. *Compare* Dkt. 564-11 at 80, *with id.* at 91.

*BMW of N. Am., LLC*, No. CV 11-7667, 2014 WL 4090564, at *16 (C.D. Cal. Apr. 29, 2014), *objections overruled*, No. CV 11-7667, 2014 WL 4090512 (C.D. Cal. June 20, 2014)). The Court finds that Shub has met his burden to establish that his rate is in line with those prevailing in the community. However, Weiss and George have not provided any reasons why their rates should be higher than the rates approved by the *Aarons* court. The Court concludes that $750 is a reasonable rate for Weiss and Shub and that $595 is a reasonable rate for George.[18]

### 3. *Other Requested Hourly Rates*

Defendants assert that the fee request includes only "self-serving declarations" and class counsel has failed to establish that any court has "approved the *particular* rates claimed by the particular lawyers billing in this case for comparable work." Dkt. 564 at 33–37 (emphasis in original). Plaintiffs counter that they provided (1) cases in which courts have approved their requested rates as reasonable; and (2) evidence that "hourly fee-paying clients have actually paid the hourly rates claimed." Dkt. 573 at 44. While there are a few exceptions, as discussed above, the Court generally agrees with defendants that class counsel's submissions "cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services." *Spegon*, 175 F.3d at 556. For example, while Steven Schwartz attests that Chimicles & Tikellis' rates "have been approved by state and federal courts throughout the coun-

---

[18] Weiss also asserts that because the *Aarons* court award $595 per hour for Seeger Weiss's associates, this Court should approve Miriam Schimmel's requested $410 per hour rate. Dkt. 576 at ¶ 6. But the Court has no biographical information for Schimmel or for the associates approved by the *Aaron* court. Therefore, as discussed *supra* § VI.B.1, the Court disallows all time claimed for Schimmel.

try, including successful consumer class cases where [the] firm served as lead class counsel," Dkt. 531-2 at ¶ 25, counsel provides no proof that each of the specific rates requested for each of the Chimicles lawyers *in this case* have been approved by another court. So even if a court approved Mr. Schwartz's requested rate of $750 at some point, the general statement in Mr. Schwartz's declaration does not establish that the billing rates of the other five attorneys from Chimicles & Tikellis were approved. Furthermore, although counsel provided an impressive description of the firm's litigation successes, including case captions, there is nothing indicating the approval of rates or what those rates were. Dkt. 531-3 at 31-48. Even if this Court were to search the dockets of these various courts for orders approving the requested rates, class counsel provides no basis for the court to conclude that these out-of-district billing rates are comparable to those in the Chicago area. *See Reid*, 2015 WL 3653318, at *15 ("Plaintiffs have offered no evidence to prove that the billing rates in each district are comparable."). This is also true for the general, unsupported statements submitted by counsel from the other firms. Dkt. 531-8 at ¶¶ 12–13 (James Rosemergy attesting that Carey Danis' rates "have been approved by state and federal courts throughout the country, including successful consumer class cases where [the firm] has served in a lead or prominent role."); Dkt. 531-11 at ¶ 5 (Richard Burke attesting that Quantum Legal's rates "for [the] firms partners, attorneys and professional support staff included in the schedule were the usual and customary hourly rates charged for their services in similar complex litigation."); Dkt. 531-13 at ¶ 8 (James Shah attesting that Shepherd Finkelman's rates "have

been approved by courts throughout the United States."). Because the Court concludes that class counsel have not met their burden of producing satisfactory evidence establishing many of their requested rates, the Court therefore may properly "make its own determination of a reasonable rate." *See Pickett*, 644 F.3d at 640.

Defendants urge the Court to rely on averaging the *Laffey* Matrix[19] and the Chicago-specific portions of the Consumer Law Report[20] to set the appropriate rates. Because these two surveys "provide substantially similar rate data based on a lawyer's years of experience, . . . [s]plitting the minimal differences between these two reliable sources yields" the appropriate market rates. Dkt. 564 at 36. The Seventh Circuit has never formally adopted the Matrix and has stated only that it "can assist the district court with the challenging task of determining a reasonable hourly rate." *Pickett*, 664 F.3d at 648. Thus, courts in this district have relied on the Matrix as one factor in determining a reasonable rate. *See Sandra T.-E. v. Sperlik*, No. 05 C 473, 2012 WL 1107845, at *1 (N.D. Ill. Apr. 1, 2012) (collecting cases). Courts in this district have also considered the Consumer Law Report in analyzing the reasonableness of proposed hourly billing rates. *Reid*, 2015 WL 3653318, at *15 (collecting cases).

---

[19] The *Laffey* Matrix is a chart of hourly rates for attorneys and paralegals in the Washington, D.C. area that was prepared by the United States Attorney's Office for the District of Columbia to be used in fee-shifting cases. *Montanez v. Simon*, 755 F.3d 547, 554 (7th Cir. 2014); *see* Dkt. 564-10 (2014–2015 *Laffey* Matrix).

[20] The United States Consumer Law Attorney Fee Survey Report publishes the survey results relating to attorney's fees for attorneys specializing in consumer law for the ten largest U.S. cities, including Chicago, IL. *Reid,* 2015 WL 3653318, at *14 n.9; *see* Dkt. 564-11 at 91 (2013–2014 Consumer Law Report for Chicago).

Plaintiffs encourage the Court to use the National Law Journal survey of hourly billing rates to cross-check their rates. Dkt. 573 at 47 (citing *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405, 2015 WL 10847814, at *18 n.15 (S.D.N.Y. Sept. 9, 2015); *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. 10-CV-0541, 2014 WL 6851612, at *6 (S.D. Cal. Dec. 3, 2014); *Blue Growth Holdings Ltd. v. Mainstreet LimitedVentures, LLC*, No. CV 13-1452, 2014 WL 3518885, at *3 (N.D. Cal. July 16, 2014); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-2177, 2013 WL 5505744, at *33 n.27 (D.N.J. Oct. 1, 2013)). Plaintiffs submitted the National Law Journal's Annual Billing Survey for 2015 (NLJ Survey) to suggest that the hourly rates they seek are "well within the range of market rates charged by attorneys of equivalent experience, skill, and expertise" for Chicago-based firms. However, courts have expressed skepticism at applying hourly rates for large international firms with corporate clients to consumer class action attorneys. *See In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 5497275, at *9 (N.D. Ill. Oct. 3, 2013), *amended*, No. 11 C 8176, 2014 WL 2809016 (N.D. Ill. June 20, 2014), *aff'd*, 799 F.3d 701 (7th Cir. 2015) (rejecting request by plaintiffs to rely on the NLJ's annual billing survey because "it would be difficult to reach a reasonable conclusion that the hourly rate charged by a 1,000-lawyer firm representing primarily large corporate clients who voluntarily choose to pay its rates is a fair point of comparison for the reasonable hourly rates for attorneys at a seven-lawyer firm that handles primarily class action and other consumer-related litigation on a contingent-fee ba-

sis"). Similarly, this Court declines to find that the NLJ Survey is binding, but will consider it as one of many factors.

### a. Nicholas Chimicles, Steven Schwartz, James Rosemergy, and Richard Burke

Class counsel seek a $950 hourly rate for Nicholas Chimicles, the named partner of Chimicles & Tikellis, who has 42 years of experience. Dkt. 531-3 at 4–5; Dkt. 531-4. Chimicles has been lead counsel and lead trial counsel in major complex litigation suits for over 30 years, including several in the Northern District of Illinois. Dkt. 531-4 at 4–5. Defendants argue that Chimicles' hourly rate should be reduced to $481. Dkt. 564 at 37.

Class counsel seeks a $750 hourly rate for Steven Schwartz, a partner with Chimicles & Tikellis, who has 28 years of experience. Dkt. 531-3 at 9–10; Dkt. 531-4. Schwartz has prosecuted a large number of consumer class actions, including multi-district and multi-state class actions in both state and federal courts. Dkt. 531-4 at 9–10; Dkt. 531-2 at ¶ 4. Mr. Schwartz, unlike some of his colleagues, affirms that he has been paid his "full billing rate for hourly work . . . in connection with class cases they brought as class representative against . . . insurers." Dkt. 531-2 at ¶ 26. Defendants argue that Schwartz's hourly rate should be reduced to $528. Dkt. 564 at 37.

Class counsel seeks a $650 hourly rate for James Rosemergy, a partner with Carey Danis, who has 17 years of experience. Dkt. 531-9 at 9; Dkt. 531-10. Rosemergy concentrates his practice in consumer and antitrust class action litigation.

Dkt. 531-9 at 9. He is also on the Board of Governors for the Missouri Association of Trial Attorneys, an organization dedicated to protecting the rights of consumers and the injured. Dkt. 531-8 at ¶ 5. Other than the first two years of his legal career, his practice "has been dedicated entirely to Plaintiff's class action and mass tort litigation." *Id.* He has served in leadership roles in numerous successful class actions. *Id.* ¶ 6. Defendants argue that Rosemergy's hourly rate should be reduced to $458. Dkt. 564 at 37.

Class counsel seeks a $720 hourly rate for Richard Burke, a partner with Quantum Legal, who has 30 years of experience. Dkt. 531-11 at 5; Dkt. 575-6 at 5. Dkt. 564 at 37. In support of Burke's rate, counsel states that he has worked on over 150 class action cases throughout the country, including complex consumer class actions and numerous high profile class action lawsuits. Dkt. 575-6 at 5–6. Defendants argue that Burke's hourly rate should be reduced to $528.

The Court finds Chimcles's, Schwartz's, Rosemergy's, and Burke's extensive class action experience persuasive and that experience places them near the 95% median rate for consumer law attorneys in the Chicago area ($630). Dkt. 564-11 at 91. Further, this rate is near the median rate for Chicago partners according to the NLJ Survey. Dkt. 573 at 46–47. Accordingly, the Court concludes that $630 is a reasonable market rate for Chimcles's, Schwartz's, Rosemergy's, and Burke's services in this case.

### b. *Timothy Mathews and Mathew Schelkopf*

Class counsel seeks a $600 hourly rate for Mathews and Schelkopf, Chimicles & Tikellis partners, with 12 and 13 years of experience, respectively.[21] Dkt. 531-3 at 13–14, 16–17; Dkt. 531-4. Mathews has litigated a broad array of subject matters in both federal and state courts. Dkt. 531-3 at 13–14. Schelkopf has extensive trial experience, with an emphasis on consumer class actions. Dkt. 531-3 at 16–17. Defendants argue that Mathews's hourly rate should be reduced to $446 and Schelkopf's to $346. Dkt. 564 at 37. The Court finds Mathews's and Schelkopf's litigation experience persuasive, and that experience should place them near the 75% median rate for consumer law attorneys in the Chicago area ($510). Dkt. 564-11 at 91. Further, this rate is within the range for Chicago partners according to the NLJ Survey. Dkt. 573 at 46–47. Accordingly, the Court concludes that $510 is a reasonable market rate for Mathews's and Schelkopf's services in this case.

### c. *Andrew Cross*

Class counsel seeks a $650 hourly rate for Cross, a partner with Carey Danis, who has 22 years of experience. Dkt. 531-9 at 8–9; Dkt. 531-10. Cross's practice focuses on consumer and mass tort litigation. Dkt. 531-9 at 9. Defendants argue that Cross's rate should be reduced to $540. Dkt. 564 at 37. The Court finds that defendant's proposed rate is appropriate in light of the information provided. This rate is near the 75% median for all consumer law attorneys in Chicago. Dkt. 564-11 at 91. Further, this rate is within the range for Chicago partners according to the NLJ

---

[21] Defendants erroneously state that Schelkopf has only seven years of experience. *Compare* Dkt. 564 at 37, *with* Dkt. 531-3 at 16.

Survey. Dkt. 573 at 46–47. Accordingly, the Court concludes that $540 is a reasonable market rate for Cross's services in this case.

### d. Anthony Geyelin and Alison Gushue

Class counsel request fees for two Chimicles & Tikellis lawyers, Anthony Geyelin and Alison Gushue, who spent a combined 1,300 hours on document review work at hourly rates of $460 and $450 per hour, respectively. Dkt. 531-3 at 18–19; Dkt. 531-4; Dkt. 564-5 at 1–17, 38–48. Geyelin is of counsel, with 10 years of experience; Gushue is an associate, with 9 years of experience. Dkt. 531-2 at ¶ 9; Dkt. 531-3 at 3, 21, 29. Defendants object, arguing that the Court "should not approve partner rates for work that could have been accomplished by contract attorneys or first-year associates at a much lower rate," and propose a $346 rate. Dkt. 564 at 37–38.

Geyelin has significant private and public sector corporate and regulatory experience, and Gushue has experience litigating consumer fraud cases. Dkt. 531-3 at 21, 29. In addition, Gushue's "familiarity with key documents, the Whirlpool and Sears record-keeping practices and document databases, and the state of the law concerning defects in front-loading washing machines translated into efficiencies for the work she performed in the CCU actions, which she has worked on from the outset." Dkt. 531-2 at ¶ 8. Geyelin is "a highly experienced document review attorney with significant experience in managing large-scale complex document review production." *Id.* at ¶ 9. Gushue and Geyelin "took responsibility for identifying from all the documents produced in the CCU/biofilm cases those that were relevant to the CCU claims case and organizing those relevant documents into detailed digests or-

ganized [by] topics for sue [*sic*] at depositions and at trial and to assist [the expert]."
*Id.*

The Court finds that Gushue and Geyelin were not performing routine document review that could have been performed by first-year associates or contract attorneys, as defendants contend. To the contrary, they were performing a high-level analysis of the documents already reviewed in order to prepare for depositions and trial. Further, the Court finds that their extensive knowledge of this case, along with their prior experiences and skill level, translated into significant efficiencies.

The Court finds Geyelin's and Gushue's extensive experience and skills highly persuasive, and that experience should place them well above the average for consumer law attorneys in the Chicago area with 6–10 years' experience. The rate for the average consumer law attorney with 6–10 years' experience is $322, while the average for 11–15 years is $432. Dkt. 564-11 at 91. Further, the average attorney rate for all attorneys is $420. Under these circumstances, the Court concludes that $425 is a reasonable market rate for Geyelin's and Gushue's services in this case. This rate is also within the range of attorneys with 8–10 years' experience ($370) and those with 11–19 years' experience ($460), according to the *Laffey* Matrix. Dkt. 564-10. And, this rate is near the median rate for Chicago associates according to the NLJ Survey. Dkt. 573 at 46–47.

### e. *Benjamin Johns, Zachary Jacobs, Grant Lee, and Tiffany Yiatris*

Class counsel seeks a $550 hourly rate for Benjamin Johns, a partner with Chimicles & Tikellis, who has 10 years of experience; a $550 hourly rate for Tiffany

Yiatras, a partner with Carey Danis, who has 10 years of experience; a $680 hourly rate for Grant Lee, a partner with Quantum Legal, who has 9 years of experience; and a $550 hourly rate for Zachary Jacobs, an associate with Quantum Legal, who has 8 years of experience. Dkt. 531-3 at 18–19; Dkt. 531-4; Dkt. 531-9 at 9; Dkt. 531-10; Dkt. 531-11 at 5; Dkt. 575-6 at 7; Dkt. 531-11 at 5; Dkt. 575-6 at 6–7; Dkt. 531-12 at 3. In support of these rates, counsel submitted sparse biographical information, which indicates only that each of these attorneys have some litigation experience. Dkt. 531-3 at 18–19; Dkt. 531-9 at 9; Dkt. 576 at 6–7. Defendants argue that Jacobs's, Lee's, and Yiatris's rates should be reduced to $346. Dkt. 564 at 37. Defendants express no opinion on Johns's rate.

The Court finds that Defendant's proposed rate is appropriate for these attorneys with 8–10 years' experience. Accordingly, the Court concludes that $346 is a reasonable market rate for Johns's, Jacobs's, Lee's, and Yiatras's services in this case.

   *f. Christina Saler*

Class counsel seeks a $500 hourly rate for Saler, a senior counsel with Chimicles & Tikellis, who has 12 years of experience focused on prosecuting class actions. Dkt. 531-3 at 24; Dkt. 531-4. Defendants argue that Saler's hourly rate should be reduced to $446. Dkt. 564 at 37. The Court finds that defendants' proposed rate is appropriate for someone of Saler's experience. This rate is near the average for all consumer law attorneys in Chicago. Dkt. 564-11 at 91. Further, this rate is within the range for Chicago associates according to the NLJ Survey. Dkt. 573 at 46–47.

Accordingly, the Court concludes that $446 is a reasonable market rate for Saler's services in this case.

### g. Aaron Morgan

Class counsel seeks a $300 hourly rate for Morgan, an associate with Carey Danis, who has 8 years of experience. Dkt. Dkt. 531-10; Dkt. 575 at ¶ 9. Defendants have not objected to this proposed rate, and the Court approves it. Morgan oversees a staff of document review attorneys, focusing on complex, mass tort and class action litigation. Dkt. 575 at ¶ 9. His work in this case occurred after the documents had been previously reviewed and was designed to gather the critical documents for trial and discovery. *Id.* at ¶ 10.

### h. Thomas Flowers

Class counsel seeks a $350 hourly rate for Flowers, an associate with Quantum Legal, who has 3 years of experience. Dkt. 531-11 at 5; Dkt. 575-6 at 6. In support of Flower's rate, counsel has submitted sparse biographical information, which indicates only that he has some experience in both federal and state court. Dkt. 575-6 at 6. Defendants express no opinion on Flowers's proposed rate.

The Court finds Flowers's experience should place him within the range for attorneys with 3–5 years of experience. Therefore, the Court will average the results of *Laffey* Matrix and the Consumer Law Report surveys. Dkt. 564-10 at 2; Dkt. 564-11 at 91. Accordingly, the Court concludes that $313 is a reasonable market rate for Flowers's services in this case.

*i. Support Staff Rate*

Class counsel seeks hourly rates ranging from $60 to $250 for support staff personnel, including paralegals and legal assistants.[22] Dkt. 531-4; Dkt. 576-1. Defendants do not propose any alternate rates; instead, they generally argue that the hours should be disallowed because no biographical information was submitted. Dkt. 584 at 17.

Courts in the Northern District of Illinois consistently award a $95–125 hourly rate to law clerks and paralegals. *Reid*, 2015 WL 3653318, at *19 (collecting cases). Further, the Consumer Law Report found that the average rate for all paralegals in Chicago is $127, and the median rate is $133. Dkt. 564-11 at 91. The *Laffey* Matrix found that the average rate for paralegals and law clerks is $150. Dkt. 564-10. Thus, taking into consideration the case law and the current rates in the Consumer Law Report and the Matrix, the Court concludes that $125 is a reasonable rate for the support staff personnel.

**4. Summary**

After considering class counsel's requested rates and defendants' objections, the lodestar in this case stands at $2,726,190 based on the following breakdown of reasonable hourly rates and hours expended:

---

[22] Specifically, the support staff personnel are Shelby Cain, Blair Epstein, Lauren Griffith, Bonnie Johnson, Corneliu Mastraghin, Phuong Ngo, and Jesse Royer, Andro Torres, and Kristin Wickline. Dkt. 531-4; Dkt. 576-1.

| Biller | Yrs[23] | Hours | Pl. Rate | Lodestar | Df. Rate | Adj. Hours | Adj. Rate | Adjusted Lodestar |
|---|---|---|---|---|---|---|---|---|
| Bennett | | 18.0 | $700 | $12,600 | | 0 | | $0 |
| Burke | 30 | 12.5 | $720 | $9,000 | $528 | 12.5 | $630 | $7,875 |
| Cain | PL | 4.0 | $175 | $700 | | 4.0 | $125 | $500 |
| Chimicles | 42 | 2.25 | $950 | $2,137 | $481 | 2.25 | $630 | $1,417 |
| Cho | A | 50.7 | $555 | $28,138 | | 0 | | $0 |
| Cross | 22 | 17.0 | $650 | $11,050 | $540 | 17.0 | $540 | $9,180 |
| Epstein | LA | 11.75 | $60 | $705 | | 11.75 | $125 | $1,469 |
| Evans | A | 12.0 | $300 | $3,600 | | 0 | | $0 |
| Ferling | | 0.8 | $185 | $148 | | 0 | | $0 |
| Flowers | 3 | 7.6 | $350 | $2,660 | | 7.6 | $313 | $2,379 |
| George | 17 | 23.4 | $650 | $15,210 | $458 | 23.4 | $595 | $13,923 |
| Geyelin | 10 | 1140.75 | $460 | $524,745 | | 1140.75 | $425 | $484,819 |
| Griffith, L. | PL | 3.0 | $215 | $645 | | 3.0 | $125 | $375 |
| Gushue | 9 | 872.5 | $450 | $392,625 | $346 | 872.5 | $425 | $370,812 |
| Jacobs | 8 | 3.8 | $550 | $2,090 | $346 | 3.8 | $346 | $1,315 |
| Johns | 10 | 1.5 | $550 | $825 | | 1.5 | $346 | $519 |
| Johnson | LA | 13.25 | $60 | $795 | | 13.25 | $125 | $1,656 |
| Lang | A | 122.3 | $635 | $77,660 | | 0 | | $0 |
| Lee | 9 | 10.2 | $680 | $6,936 | $346 | 10.2 | $346 | $3,529 |
| Lichtman | 9 | 11.4 | $515 | $5,871 | $346 | 11.4 | $515 | $5871 |
| Lotus | A | 15.0 | $625 | $9,375 | | 0 | | $0 |
| Mastraghin | LA | 1.75 | $250 | $437 | | 1.75 | $125 | $219 |
| Mathews | 12 | 31.75 | $600 | $19,050 | $446 | 31.75 | $510 | $16,192 |
| Miller | A | 63.7 | $490 | $31,213 | | 0 | | $0 |
| Morgan | 8 | 1047.0 | $300 | $314,100 | | 800.0 | $300 | $240,000 |
| Murray | | 0.6 | $280 | $168 | | 0 | | $0 |
| Ngo | LA | 5.0 | $100 | $500 | | 5.0 | $125 | $625 |
| Rosemergy | 17 | 1348.3 | $650 | $876,395 | $458 | 1348.3 | $630 | $849,429 |
| Royer | LA | 5.0 | $150 | $750 | | 5.0 | $125 | $625 |
| Saler | 12 | 37.75 | $500 | $18,875 | $446 | 37.75 | $446 | $16,836 |
| Saunders | A | 4.25 | $275 | $1,169 | | 0 | | $0 |
| Schelkopf | 7 | 17.0 | $600 | $10,200 | $346 | 17.0 | $510 | $8,670 |
| Schimmel | A | 19.6 | $410 | $8,036 | | 0 | | $0 |
| Schwartz | 28 | 877.4 | $750 | $658,050 | $528 | 878.7 | $630 | $553,581 |
| Selbin | 23 | 7.0 | $800 | $5,600 | $540 | 7.0 | $800 | $5,600 |
| Shah | | 36.2 | $725 | $26,245 | | 0 | | $0 |
| Shub | 27 | 6.0 | $750 | $4,500 | $528 | 6.0 | $750 | $4,500 |
| Srinivasan | | 13.0 | $395 | $5,135 | | 0 | | $0 |
| Torres | PL | 0.6 | $215 | $129 | | 0.6 | $125 | $75 |
| Weiss, P. | OC | 16.3 | $720 | $11,736 | | 0 | | $0 |

[23] PL=paralegal; LA=legal assistant; A=associate; OC=of counsel

| Biller | Yrs[23] | Hours | Pl. Rate | Lodestar | Df. Rate | Adj. Hours | Adj. Rate | Adjusted Lodestar |
|---|---|---|---|---|---|---|---|---|
| Weiss, S. | 24 | 0.5 | $850 | $425 | | 0.5 | $750 | $375 |
| Wickline | PL | 3.2 | $210 | $672 | | 3.2 | $125 | $400 |
| Yiatras | 10 | 16.3 | $550 | $8,965 | $346 | 16.3 | $346 | $5,640 |
| Lieff Appeal | | 221.95 | | $139,885 | | 159.75 | | $117,785 |
| Total | | 6133.85 | | $3,249,750 | | | | $2,726,191 |

## C. Adjustment of the Lodestar Under *Hensley*

"After calculating the lodestar, the Court may, in its discretion, increase or reduce the lodestar amount by considering a variety of factors, including: the time and labor required; whether the attorney's fee is fixed or contingent; the amount involved and the results obtained; and the experience, reputation, and ability of the attorneys." *Reid*, 2015 WL 3653318, at *24 (citing *Hensley,* 461 U.S. at 430 n.3). "The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (citation omitted). However, the presumption is that "the lodestar includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010) (citation omitted); *see Hensley*, 461 U.S. at 434 n.9 ("many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate"). Thus, "factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar." *Perdue*, 559 U.S. at 546. In that respect, the party seeking fees "has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* Although the Supreme Court "has never sustained an enhancement of a lodestar

amount for performance," it has "repeatedly said that an enhancement may be awarded in 'rare' and 'exceptional' circumstances." *Id.* at 552 (citation omitted).

Class counsel acknowledges that many of the *Hensley* factors are subsumed in the base lodestar calculation but argues that the base lodestar calculation does not include "the novelty/complexity of the legal issues involved, the degree of success obtained, the public interest advanced by the litigation, the fact that fees were contingent on the outcome of the case, and to a lesser extent the preclusion of certain Class Counsel from working on other cases." Dkt. 531 at 11. Thus, they argue that they should receive a positive multiplier of 1.85. Dkt. 575 at 51.

Defendants, on the other hand, contend that "[g]iven Class Counsel's relative lack of success on behalf of the class compared to their goals, the Court should make a substantial *downward* adjustment to the base lodestar." Dkt. 564 at 41 (emphasis in original). Defendants argue that if "all purchasers of the class washers were injured when they purchased a washing machine with a poorly designed CCU," as class counsel assert in their reply, Dkt. 573 at 3, "why did Class Counsel agree to a settlement that does not provide *any* recovery to the overwhelming majority of those allegedly injured Settlement Class Members?" Dkt. 584 at 1 (emphasis in original). Defendants contend that the Court should reject the $6 million fee request—which will be 6.75 to 11 times the amount that the Settlement Class will receive, Dkt. 584 at 3, and instead "award Class Counsel no more than 50% of the aggregate settlement value in fees, or up to approximately $890,000 depending on the final claims data," *id.* at 4.

### *1. Degree of Success*

Class counsel argues that they achieved "a significant degree of success on be-half of the class" because class members "are entitled to claim full *cash* reimburse-ments for out-of-pocket losses." Dkt. 531 at 31–32 (emphasis added). Defendants contend that class counsel achieved "meager" results because "only a tiny percent-age" of all washer buyers received any compensation under the settlement. Dkt. 564 at 42–43. Defendants assert that plaintiffs originally claimed that *all* washer buy-ers "were injured because they would not have bought, or would have paid less for, the Washers if [they had] known about the alleged CCU defect." *Id.* at 42. Instead, the settlement "pays benefits *only* to those class members who potentially had a col-orable warranty claim" as *defendants* had long argued. *Id.* at 43. Thus, defendants argue that because class counsel "achieved only the *opportunity* to obtain relief for less than 5% of the CCU class . . . , Class Counsel's proposed 1.9 multiplier is over-reaching, at best." *Id.* (emphasis in original).

Defendants are conflating the concepts of injury and damages. While plaintiffs have alleged that all buyers were injured when they purchased a washing machine with a poorly designed CCU, plaintiffs have also emphasized for some time that they were seeking damages only for those buyers where the washer defect manifest-ed itself. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that "a class will often include persons who have not been injured by the defendant's conduct"). The Consolidated Class Action Complaint, filed in February 2009, sought only replacement, recall or repair costs "attributable to the defects."

Dkt. 137 at ¶ 5. Similarly, the Amended Consolidated Class Action Complaint, filed in August 2009, alleged that "Sears is obligated under the terms of its written warranty to repair and/or replace the *defective* Washing Machines sold to Plaintiffs and members of the Classes." Dkt. 162 at ¶ 112 (emphasis added). In plaintiffs' brief opposing defendants' request in October 2011 to an interlocutory appeal of the district court's order certifying a CCU class, plaintiffs reiterated that they had "defined an objectively identifiable class containing only those people who own washers that were manufactured using a defective process, and Plaintiffs seek relief *for only those whose CCUs have failed*, for breach of warranty." *Butler v. Sears, Roebuck and Co.*, No. 11-8029 (7th Cir. Oct. 24, 2011) (Plaintiffs-Respondents' Brief in Opposition To Sears' Petition for Permission To Appeal Pursuant To Federal Rule of Civil Procedure 23(f)) (emphasis added). Plaintiffs made similar assertions in their April and December 2013 briefs in opposition to defendants' petitions for writs of certiorari:

> The issues raised in connection with the CCU class are straightforward: either the CCU manufacturing process at the particular subpart vendor was or was not defective for a short period of time and, if it was, Sears' warranty either does or does not obligate it to fix Kenmores that fail as a result. Perhaps most importantly for present purposes, the CCU class will provide relief, if at all, *only to individuals whose machines have manifested the defect.*

*Sears, Roebuck and Co. v. Butler*, 2013 WL 1836534 (U.S.), 8 (emphasis added).

> [I]n a design defect case, it is the allegedly defective design that establishes the breach of warranty and injury-in-fact at the point of sale, which is the reason that the class is properly defined to include . . . only those purchasers who own the machines manufactured with the substandard process and part (identifiable by serial numbers on the machines). The CCU class seeks to have Petitioners *cover the costs or repair or replacement for those units that have failed.*

*Whirlpool Corp. v. Glazer*, 2013 WL 6493514 (U.S.), 25 (emphasis added).

Consistent with these allegations, the settlement provides that *all* persons who own washers that were manufactured with the defective process will receive notice and *all* persons with CCU units that have failed will be fully compensated. Under these circumstances, the Court finds that class counsel achieved a high degree of success.

### 2. *Novelty/Complexity*

Class counsel contends that the case involved "complex issues of multi-state class certification, liability standards, electrical engineering, and uncertainty how to prove damages except on some individual basis." Dkt. 531 at 30. They argue that the legal complexity is demonstrated by the multiple rounds of briefing in the Seventh Circuit and Supreme Court "to beat back repeated attempts to dismiss the complaint in its entirety and strike plaintiffs' class allegations." *Id.* Further, class counsel asserts that the case was complicated from a factual perspective because of "questions regarding electronic defects, acceptable defect rates, and the digestion of highly technical information regarding the use of CEM-1 versus CEM-3 or FR-4 circuit boards." *Id.* at 30–31. Defendants contend, on the other hand, that this case is "a run-of-the-mill warranty case pled as an overbroad class action." Dkt. 564 at 44.

The Court concludes this factor weighs in favor of a multiplier. While this case may have involved some complex legal and factual issues, most were not "rare or exceptional," justifying a lodestar increase. For example, the need for expert opinion in a consumer class action is not unusual. *See Perdue*, 559 U.S. at 553 ("the novelty and complexity of a case generally may not be used as a ground for an enhance-

ment because these factors presumably are fully reflected in the number of billable hours recorded by counsel") (citation omitted); *Reid*, 2015 WL 3653318, at *25 (finding no significant complexities in a case brought under the Magnuson-Moss Warranty Act that would justify a lodestar enhancement). On the other hand, the Seventh Circuit issued two opinions in this case addressing difficult questions regarding standards for class certification. The second of these opinions, which has already been cited in over 150 other cases around the country, opined that even post the Supreme Court's ruling in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), individual questions with respect to damages do not defeat class certification. *See Butler*, 727 F.3d at 801 ("It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits."). This statistic reveals class counsel did have to address novel and complex legal issues. *Cf. Reid*, 2015 WL 3653318, at *25 (declining to award any multiplier where case settled after only 18 months and did not present any novel or complex issues).

### 3. *Public Interest Advanced*

Class counsel asserts that the case "advanced existing law and created new law in the area of multi-state class certification and consumer claims where the defect does not manifest itself in each and every product," and will therefore benefit consumers in other cases. Dkt. 531 at 33. Defendants contend "public interest" applies only where "Congress or a state legislature has encouraged litigation," which is not present here. Dkt. 564 at 45.

The Court finds otherwise. Congress has determined that it is in the public interest to "encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1). Thus, this settlement encourages manufacturers to expeditiously identify and cure defects in their products, regardless of whether the defect manifests itself in every item sold.

### 4. *Contingent Fees*

Class counsel contends that the Court "*must* award a multiplier when attorneys' fees are contingent upon the outcome of the case." Dkt. 573 at 50. In common fund cases, "a risk multiplier is not merely available . . . but mandated." *Florin*, 34 F.3d at 565. But when granting attorney's fees under a fee-shifting statute, "courts may not enhance a fee award above the lodestar amount to reflect risk of loss or contingency." *Id.* at 564. Here, given that the Magnuson-Moss Warranty Act contains a fee-shifting provision, the Court declines to increase plaintiffs' lodestar on the basis of the risk of nonpayment involved in the case.

### 5. *Preclusion of Class Counsel from Working on Other Cases*

Class counsel argues that the case required "significant work" from all attorneys, especially for Alison Gushue and Tony Geylelin, who worked "virtually full time" on the case for a 5-month period, and co-lead counsel Steve Schwartz and James Rosemergy, who devoted "large swaths of time" to this case. Dkt. 531 at 33. Defendants contend that the fact that two attorneys worked full time for five months—out of the eight years this case has been pending—does not merit a lodestar enhancement. Dkt. 564 at 45. The Court agrees. There is nothing "rare or exceptional" about two senior associates working full time for five months or lead counsel devoting "large swaths of time" to a multi-state class action.

### 6. *Summary*

Taking all these circumstances into consideration—the high degree of success, the vindication of a public interest, the presence of novel and complex legal issues—the Court finds that a multiplier is appropriate here. Given that the most important factor is the "results obtained," *Hensley*, 461 U.S. at 434, class counsel is entitled to a significant lodestar enhancement. The Seventh Circuit has suggested "that a doubling of the lodestar would provide a sensible ceiling." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988); *see Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("We also have speculated that a multiplier of 2 may be a sensible ceiling."); *accord Southwest. Airlines*, 2013 WL 5497275, at *12. *Abbott v. Lockheed Martin Corp.*, No. 06 CV 701, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015) ("Between 1993 and 2008, the mean multiplier in class actions in the Seventh Circuit was

1.85.") (citing Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlement: 1993–2008*, 7 J. Empirical Legal Stud. 248, 272 (Table 14) (2010)).

The Court will award a multiplier of 1.75. When applied to the lodestar figure of $2,726,191, this yields attorney's fees totaling $4,770,834.

## VII. COSTS

The parties have largely agreed on the amount of costs that class counsel may claim. Dkt. 573 at 53; Dkt. 584 at 24 (agreed-upon expenses related to prosecuting the CCU claims is $167,717). They disagree, however, as to whether defendants should reimburse class counsel for plaintiffs' portion of the CCU-related bills submitted by the Special Master. *Id.* Class counsel contends that the Special Master's CCU-related fees are "reasonable bills incurred as part of the litigation," for which they should be reimbursed. Dkt. 573 at 53; Dkt. 587 at 51. But class counsel did not include the Special Master's fees in their Motion—they sought fees paid to their experts, deposition expenses, travel costs, computer research, investigation, and photocopying costs. Dkt. 531 at 34–35 & Ex. 8. Nor did class counsel raise the issue of the Special Master's fees in their negotiations with defendants in an effort to agree on class counsel's requested costs. Dkt. 584 at 24; Dkt. 584-2 at ¶ 22. Indeed, "[a]t no time during . . . negotiations in late January and early February [2016] did Class Counsel request that they be reimbursed for Special Master Cohen's fees, nor did they produce . . . copies of any of Mr. Cohen's invoices for which Class Counsel seek

reimbursement." Williams Decl. ¶ 22. Thus, defendants argue that class counsel's request should be denied as untimely. Dkt. 584 at 24.

The Court agrees. It is well settled that parties waive arguments raised for the first time in a reply. *See*, *e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008); *Rives v. Whiteside Sch. Dist. No. 115*, 575 F. App'x 678, 680 (7th Cir. 2014); *Empire Elecs., Inc. v. D&D Tooling & Mfg., Inc.*, No. 13 C 376, 2014 WL 5819728, at *6 (N.D. Ill. Nov. 10, 2014); *Burks v. U.S. Postal Serv.*, No. 08 C 5869, 2009 WL 1097508, at *3 (N.D. Ill. Apr. 17, 2009). By not raising the issue of the Special Master's fees until three months after filing their motion for fees and costs, the Court finds that class counsel have waived the request.

The Court awards class counsel costs in the amount of $167,717, plus any reasonable expenses incurred in connection with the final approval hearing and class counsel's duties in connection with the ongoing notice and claims process, subject to the agreed-upon $200,000 cap.

E N T E R:

Dated: September 13, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge